# FEDERAL POWER COMMISSION *v.* UNION ELECTRIC CO.

No. 123. Argued March 2, 1965.—
Decided May 3, 1965.

*Ralph S. Spritzer* argued the cause for petitioner. With him on the brief were *Solicitor General Cox, Frank Goodman, Richard A. Solomon* and *Howard E. Wahrenbrock.*

*Robert J. Keefe* argued the cause for respondent. With him on the brief was *Robert F. Schlafly.*

MR. JUSTICE WHITE delivered the opinion of the Court.

Section 23 (b) [1] of the Federal Power Act [2] requires any person desiring to construct a dam or other project on a nonnavigable stream, but one over which Congress has jurisdiction under its authority to regulate commerce, to file a declaration of intention with the Federal Power Commission. If the Commission finds that "the interests of interstate or foreign commerce would be affected by such proposed construction," the declarant may not construct or operate the project without a license. The issue here is whether the construction of a pumped storage hydroelectric project generating energy for interstate transmission is one which would affect the "interests of interstate or foreign commerce" within the intendment of the Act.

---

[1] 49 Stat. 838, 846, 16 U. S. C. § 817 (1958 ed.).

[2] The Federal Power Act was originally enacted in 1920 as the Federal Water Power Act, 41 Stat. 1063. The original Act was amended by Title II of the Public Utility Act of 1935, 49 Stat. 838, 16 U. S. C. §§ 791–823 (1958 ed.), and made Part I of the Federal Power Act. Parts II and III, dealing with regulation of electric utility companies, were added. To distinguish the original Federal Water Power Act, which was kept largely intact, from Parts II and III, Part I will be referred to in this opinion under its original title.

## I.

Respondent Union Electric Co. (Union), operating generating plants and an interconnected transmission and distribution system in Missouri, Illinois, and Iowa, filed a declaration of intention pursuant to § 23 (b) to construct a pumped storage hydroelectric facility, the Taum Sauk installation, as a part of Union's interstate system. The pumped storage plant, an engineering innovation of growing use, is to supplement the energy produced by other plants during periods of peak demands. During such periods it generates energy through use of hydroelectric units driven by water falling from an elevated reservoir into a lower pool.[3] During off-peak periods it uses energy from other sources to pump water from the lower pool back to the headwater pool.[4] The project is capable

---

[3] A pumped storage facility may be likened to a large storage battery, taking electric energy from other sources, usually steam-electric plants, during some hours of the day, and supplying energy to an integrated system during other hours. The water in the upper pool may thus be regarded as the equivalent of stored electric energy. Pumped storage installations fall into two categories, those in which pumped storage facilities are added to a conventional hydro installation, and those which are exclusively pumped storage, generating power solely by circulating water between a lower and higher reservoir. Within these categories pumped storage installations vary widely in design and mode of operation. F. P. C., 1964 National Power Survey, Part I, 120–124. Existing combined pumped storage hydroelectric projects include Rocky River, Conn. (1929); Buchanan, Tex. (1950); Flatiron, Colo. (1954); Hiwassee, N. C. (1956); and Lewiston, N. Y. (1961). The pure pumped storage installations are of more recent vintage, with the following projects planned or recently constructed: Yards Creek, N. J.; Cabin Creek, Colo.; Muddy Run, Pa.; Ludington, Mich.; Cornwall, N. Y.; and the Taum Sauk project. See id., at 122–123.

[4] At Taum Sauk the upper reservoir is a 32-acre pool constructed atop a mountain, at about 1,500 feet above sea level, and the lower reservoir, impounded by a 60-foot dam, covers about 370 acres and has a usable storage capacity of 4,350 acre-feet of water. The two

of creating up to 350 megawatts and the energy created will be utilized in Missouri, Illinois, and possibly Iowa. Taum Sauk is to be located on the East Fork of the Black River, about four miles above the confluence of these waters.[5] The East Fork is a nonnavigable tributary of the Black River, itself a navigable stream along with the White River into which it flows.

The FPC found the East Fork was a stream "over which Congress has jurisdiction under its authority to regulate commerce," since it is a headwater of a navigable river system. The project would affect the interests of commerce and would require a license, the FPC also held, both because it contemplated the utilization of water power for the interstate transmission of electricity and because it would affect downstream navigability, 27 F. P. C. 801. The Court of Appeals reversed, 326 F. 2d 535 (C. A. 8th Cir.) holding that the only "commerce" which is relevant to the FPC's determination under § 23 (b) is commerce on the downstream navigable waterway and that the project in question would have no significant impact on water commerce.[6] Absent an

---

are connected by a pressure tunnel and conduit, with a pumping and generating station on an open channel running to the lower pool.

[5] During normal stream flows and normal operations of the project, there would be no increase or decrease of the natural stage or flow of waters below the dam. In the event of malfunction or abnormal flows, the project might affect the level of both the East Fork and Black River.

[6] The trial examiner found that the Taum Sauk project would affect the navigable capacity of the Black River. Although the Commission directed most of its opinion to the issue of whether the project affected the interests of commerce because a substantial part of its power is transmitted in interstate commerce, it concurred in the examiner's finding that the project may, under certain conditions, affect the navigability of the Black River. The Court of Appeals reversed the latter holding on the ground that the finding was not supported by substantial evidence. The question presented in the petition for certiorari was whether the generation of energy for inter-

effect on downstream navigability, or on irrigation development, flood control projects or planned utilization of water resources, matters which might affect the interests of water commerce, a water power project located on the headwaters of a navigable river is a "local" activity beyond the licensing power and consequent regulatory controls of the FPC. Because the question is an unresolved one of jurisdiction over an important class of hydroelectric projects, we granted certiorari, 379 U. S. 812, and now reverse the judgment of the Court of Appeals. We have determined that its limitation of the FPC's licensing power to projects affecting commerce on navigable waters is founded upon an erroneous reading of the language of § 23 (b) and the design and purposes of the Federal Water Power Act.

## II.

To focus the inquiry, it is well to state what is not involved in this case. There is no question that the interstate transmission of electric energy is fully subject to the commerce powers of Congress. *Public Utilities Comm'n v. Attleboro Steam & Elec. Co.*, 273 U. S. 83, 86; *Electric Bond & Share Co.* v. *Securities & Exchange Comm'n*, 303 U. S. 419, 432–433. Nor is there any doubt today that projects generating energy for such transmission, such as Taum Sauk, affect commerce among the States and therefore are within the purview of the commerce power, quite without regard to the federal control of tributary streams and navigation. See *Labor Board* v. *Jones & Laughlin Steel Corp.*, 301 U. S. 1, 40–41; *Labor Board* v. *Fruehauf*

state transmission was a sufficient basis for requiring a license, although the Commission reserved in a footnote the right to argue the correctness of the alternative holding. We do not determine whether this issue is properly here or decide whether there is substantial evidence to support a finding of effect on navigability; our discussion proceeds on the assumption that the Court of Appeals was correct in determining that there was not.

*Trailer Co.,* 301 U. S. 49; *Consolidated Edison* v. *Labor Board,* 305 U. S. 197; *Katzenbach* v. *McClung,* 379 U. S. 294, 301–304. But see *United States* v. *Appalachian Power Co.,* 107 F. 2d 769, rev'd on other grounds, 311 U. S. 377.[7] Thus, there are no constitutional doubts or barriers to the FPC's interpretation. The only question is whether Congress has required a license for a water power project utilizing the headwaters of a navigable river to generate energy for an interstate power system. We think an affirmative answer is required by both the language and purposes of the Act.

The language of the Act, in our view, plainly requires a license in the circumstances of this case. Section 23 (b)[8]

---

[7] *Utah Power & Light Co.* v. *Pfost,* 286 U. S. 165, cited by the Court of Appeals, is not opposed. The Court there held that a State had power to impose a tax on a company generating electric energy for distribution in interstate commerce. This, of course, does not control the commerce powers of Congress. Cf. *Edison Co.* v. *Labor Board,* 305 U. S. 197; *Polish Alliance* v. *Labor Board,* 322 U. S. 643, 649: "[F]ederal regulation does not preclude state taxation and state taxation does not preclude federal regulation."

[8] Section 23 (b) reads:

"It shall be unlawful for any person . . . for the purpose of developing electric power, to construct, operate, or maintain any dam, water conduit, reservoir, power house, or other works incidental thereto across, along, or in any of the navigable waters of the United States, or upon any part of the public lands or reservations of the United States (including the Territories), or utilize the surplus water or water power from any Government dam, except under and in accordance with . . . a license granted pursuant to this Act. Any person . . . intending to construct a dam or other project works across, along, over, or in any stream or part thereof, other than those defined herein as navigable waters, and over which Congress has jurisdiction under its authority to regulate commerce with foreign nations and among the several States shall before such construction file declaration of such intention with the Commission, whereupon the Commission shall cause immediate investigation of such proposed construction to be made, and if upon investigation it shall find that the interests of interstate or foreign commerce would be affected by such proposed

prohibits construction of nonlicensed hydroelectric projects on navigable streams, regardless of any effect, detrimental or beneficial, on navigation or commerce by water and requires those proposing a project on a nonnavigable stream to file a declaration of intention and to come before the Commission for a determination of whether the "interests of interstate or foreign commerce would be affected," a determination which obviously does not speak in terms of the interests of navigation or water commerce. Plainly the provision does not require a license only where "the interests of interstate or foreign commerce *on navigable waters* would be affected." Although transportation on interstate waterways is interstate commerce, the phrase "affect the interests of commerce" on its face hardly supports any claim that Congress sought to regulate only such transportation. Rather, it strongly implies that Congress drew upon its full authority under the Commerce Clause, including but not limited to its power over water commerce. "[H]alf a dozen enactments, other than the National Labor Relations Act, are sufficient to illustrate that when [Congress] wants to bring aspects of commerce within the full sweep of its constitutional authority, it manifests its purpose by regulating not only 'commerce' but also matters which 'affect,' 'interrupt,' or 'promote' interstate commerce. . . . In so describing the range of its control, Congress is not indulging stylistic preferences." *Polish National Alliance* v. *Labor Board,* 322 U. S. 643, 647.

The scope of this language is not restricted by the earlier clause in § 23 (b) limiting the filing requirements

construction, such person . . . shall not construct, maintain, or operate such dam or other project works until it shall have applied for and shall have received a license under the provisions of this Act. If the Commission shall not so find, and if no public lands or reservations are affected, permission is hereby granted to construct such dam or other project works in such stream upon compliance with State laws."

to projects on nonnavigable streams "over which Congress has jurisdiction under its authority to regulate commerce" that is, tributaries of river systems necessitating supervisory power to preserve or improve downstream navigability or water commerce generally. See *United States v. Rio Grande Dam & Irrigation Co.*, 174 U. S. 690; *Phillips v. Guy F. Atkinson Co.*, 313 U. S. 508. This language merely designates those who must file·a declaration of intention—all those who would locate a water power project on a nonnavigable stream within the jurisdiction of Congress are required to declare their intention so that the Commission may determine the necessity for a license. Congress then proceeds to invoke its full authority over commerce, without qualification, to define what projects on nonnavigable streams are required to be licensed. Respondent asserts that commerce must mean the same thing in both the filing and licensing requirements of § 23 (b); because of the allusion to water commerce in the filing provision, the Commission's inquiry into the effect of the project on commerce must be limited to the source of Congress' power over the stream. Nothing in the structure or syntax of § 23 (b) compels this conclusion. Indeed, in describing in distinct terms the standard for who must file and what must be licensed,[9] the more compelling inference is that Congress in-

---

[9] To be sure the requirement that the project be on a stream over which Congress has jurisdiction delimits the cases in which the Commission need inquire into the project's effect on commerce, leaving the theoretical possibility that some projects affecting commerce need not be licensed because they are located on waters beyond cognizance under the Commerce Clause. But it has not been shown that this possibility is anything more than theoretical. To the extent there are such projects, there is nothing inconsistent between a narrow exemption for projects located on intrastate nonnavigable waters which do not flow into any navigable streams and an intent to reach all projects affecting commerce generally when located on the more typical stream.

tended the inquiry into the project's effect on commerce to include, but not be limited to, effect on downstream navigability.[10]

Turning to the purposes of the Federal Water Power Act, enacted in 1920, we find nothing which casts serious doubt upon our reading of § 23 (b) or which indicates that the Commission was to restrict its considerations under § 23 (b) to effect on navigability. There is much to indicate the contrary.

The central purpose of the Federal Water Power Act was to provide for the comprehensive control over those uses of the Nation's water resources in which the Federal Government had a legitimate interest; these uses included navigation, irrigation, flood control, and, very prominently, hydroelectric power—uses which, while unregulated, might well be contradictory rather than harmonious.[11]   Prior legislation in 1890 and the Rivers and Har-

---

[10] Respondent also underscores the statutory directive requiring determination of whether the "proposed *construction*" of the dam or project works would affect commerce and urges that the use of this term indicates the provision refers to effect on navigation. Whether inquiry be limited to such effects or extend to matters affecting the interests of commerce generally, an intelligible determination perforce entails consideration of the nature of the project, its intended use and its mode of operation and not only that of the physical construction.   Further, the statute provides that upon finding that the project will have an effect on commerce, the declarant "shall not *construct, maintain,* or *operate* such dam or other project works" without a license.

[11] H. R. Rep. No. 61, 66th Cong., 1st Sess.; 58 Cong. Rec. 1932, 1936–1940; 59 Cong. Rec. 241, 1039–1042, 1173–1174.   See also 42 Cong. Rec. 6968; S. Doc. No. 325, 60th Cong., 1st Sess., 25.

The movement toward the enactment of the Act in 1920 may be said to have taken its keynote from President Roosevelt's veto of a bill which would have turned over to private interests important power sites on the Rainy River.   He said:

"We are now at the beginning of great development in water power. Its use through electrical transmission is entering more and more largely into every element of the daily life of the people.   Already

bors Act of 1899,[12] prohibiting the erection of any obstruction to navigation, including those on nonnavigable feeders, *United States* v. *Rio Grande Dam & Irrigation Co.,* 174 U. S. 690, and requiring the consent of Congress and approval of the Secretary of War before constructing a bridge, dam, or dike along or in navigable waters, was thought inadequate, for it accommodated only the federal interest in navigation. As this Court has had occasion to note before, the 1920 Federal Water Power Act "was the outgrowth of a widely supported effort of the conservationists to secure enactment of a complete scheme of national regulation which would promote the comprehensive development of the water resources of the Nation, in so far as it was within the reach of the federal power to do so . . . ." *First Iowa Hydro-Electric Coop.* v. *Federal Power Comm'n,* 328 U. S. 152, 180. The principal use to be developed and regulated in the Act, as its title indicates, was that of hydroelectric power to meet the needs of an expanding economy.[13]

---

the evils of monopoly are becoming manifest; already the experience of the past shows the necessity of caution in making unrestricted grants of this great power.

   .       .       .       .       .

"It should also be the duty of some designated official to see to it that in approving the plans the maximum development of the navigation and power is assured, or at least that in making the plans these may not be so developed as ultimately to interfere with the better utilization of the water or complete development of the power." 42 Cong. Rec. 4698.

The history of the movement and its objectives are well recounted in Kerwin, Federal Water-Power Legislation 105–293 (hereafter Kerwin); Pinchot, The Long Struggle for Effective Federal Water Power Legislation, 14 Geo. Wash. L. Rev. 9 (1945).

[12] 26 Stat. 453, 454; 30 Stat. 1121, 1151; 33 U. S. C. §§ 401, 403 (1958 ed.).

[13] "The increasing need of power, resulting through our participation in the war and growing shortage in certain sections of our coal and oil supply, compelled attention to the urgency of immediate

The provisions of the Act reflect these objectives. The preface states that besides navigation and the creation of the Commission, the Act was "to provide for the . . . development of water power; the use of the public lands in relation thereto . . . and for other purposes." 41 Stat. 1063. Section 10 (a), as amended, requires as a condition for obtaining a license that the proposed project "be such as in the judgment of the Commission will be best adapted to a comprehensive plan for improving or developing a waterway or waterways for the use or benefit of interstate or foreign commerce, for the improvement and utilization of water-power development, and for other beneficial public uses . . . ." [14] Other provisions regulate the operations, services, charges, and duration of hydroelectric plants,[15] "provisions . . . not essential to or

and comprehensive water-power legislation. . . . [T]he need for legislation for the development of hydroelectric power at the present time is clearly set forth by Secretary Houston in a recent report." H. R. Rep. No. 61, 66th Cong., 1st Sess., 4.

"If 10 years ago, instead of enacting restrictive laws which have prohibited development of our water powers, Congress had invited their development through fair and reasonable terms, the beginning of the World War would have found the United States with 20,000,000 developed hydroelectric power instead of 5,000,000. . . .

.       .       .       .       .

"The necessity for the development of our water power is of paramount importance to the people of the United States, and Congress should enact a law without further delay . . . ." 59 Cong. Rec. 241, 244 (remarks of Senator Jones in introducing the bill).

See also 59 Cong. Rec. 1222–1224, 1039, 1042, 1048; S. Rep. No. 180, 66th Cong., 1st Sess.

[14] 49 Stat. 842, 16 U. S. C. § 803 (a) (1958 ed.).

[15] These conditions require that the project shall be maintained in good repair and operated in the interests of navigation, amortization reserves shall be maintained after the twentieth year of operation out of any excess return on net investment, annual charges shall be paid to the United States, excessive profits, unregulated by state authority, shall be expropriated to the United States, § 10, 49 Stat. 842, 16 U. S. C. §§ 803 (b), (c), (d), (e) (1958 ed.), and rates and

even concerned with navigation as such," but which "have an obvious relationship to the exercise of the commerce power." *United States* v. *Appalachian Power Co.,* 311 U. S. 377, 424, 427. In order to insure comprehensive control over the utilization of the Nation's waterways, "navigable stream" was broadly defined to include the interrupting falls, shallows, rapids and the waterways authorized by or recommended to Congress for improvement; [16] and other recognized sources of federal authority were invoked, such as jurisdiction over public lands and national forests.[17]

If the comprehensive development of water power, "in so far as it was within the reach of the federal power to do so," *First Iowa Hydro-Electric Coop.* v. *Federal Power Comm'n,* 328 U. S., at 180, was the central thrust of the Act, there is obviously little merit to the argument that § 23 (b) requires a license when the interests of water commerce are affected but dispenses with the license when other commerce interests are vitally involved. The purposes of the Act are more fully served if the Commission must, as it held in this case, consider the impact of the project on the full spectrum of commerce interests.

### III.

Union's earnest position, however, is that the legislative history of the Act reveals a more limited purpose and requires a narrower construction of § 23 (b). The core of the argument is that the constitutional basis for the Act generally and for § 23 (b) in particular was the

---

services for energy; absent state regulation, shall be reasonable and adequate, § 19, 41 Stat. 1073, 16 U. S. C. § 812 (1958 ed.). Under § 14, 49 Stat. 844, 16 U. S. C. § 807 (1958 ed.), the United States may recapture any project after expiration of the license, upon payment of the net investment in the property.

[16] § 3 (8), 49 Stat. 838, 16 U. S. C. § 796 (8) (1958 ed.).

[17] § 4 (e), 49 Stat. 840, 16 U. S. C. § 797 (e) (1958 ed.).

authority of Congress over navigation, that Congress invoked only this power, and no other, and that § 23 (b) accordingly provides for no greater control over projects on nonnavigable streams than is necessary to protect downstream navigability. On these matters, it is said, both conservationists and opponents of the Act agreed. Moreover, the argument continues, the limited reach of § 23 (b) is confined by the repeated references to navigation and to congressional power over it in the course of committee hearings and reports on the 1935 amendments to the Act.

We cannot distill as much as Union does from the long and intense legislative struggle to enact what was a decided innovation in federal policy. The Act unquestionably involved an invocation of the congressional power over navigation under the Commerce Clause, since it required a license to build any water power project on a navigable stream, broadly defined,[18] regardless of any actual effect on navigation. There was, consequently, considerable debate about the scope and extent of the federal power over river navigation, about the definition of "navigable waters" and about the authority of Congress to impose controls and conditions having little relevance

---

[18] § 3 (8), 49 Stat. 838, 16 U. S. C. § 796 (8) (1958 ed.).

Earlier versions of the Act would have defined "navigable waters" to include only such streams or parts thereof which in their ordinary natural condition are used for the transportation of persons and property in interstate commerce or which through improvements shall become usable in such commerce. S. 1419, 65th Cong., 1st Sess.; H. R. 3184, 66th Cong., 1st Sess. The conservationists noted that this definition excluded falls, shallows and rapids, thought to be rather valuable sites for hydroelectric projects. 57 Cong. Rec. 4638. A filibuster in the closing hours of the session in 1919 prevented enactment of S. 1419, Kerwin 253–254, and the definition of navigation in H. R. 3184 was amended by the Senate Commerce Committee to include interrupting falls and shallows and rapids as well as streams cited for improvement. S. Rep. No. 180, 66th Cong., 1st Sess.

to the protection of navigation.[19] Some thought the Commerce Clause did not extend to anything but the navigable mainstream itself, and then only for the purpose of preserving or improving water transportation. This broad objection to the Act found expression in remarks directed at § 23 (b) and in assertions that the power over navigation was not sufficient to require the licensing of projects on nonnavigable streams, save perhaps where downstream navigability was substantially affected.[20]

---

[19] See, *e. g.*, 59 Cong. Rec. 1041–1042, 1430–1432, 1472, 6529–6531, 6536, 7723–7729.

These objections may be found in the debates on the earlier versions of water power legislation, notwithstanding that "navigable waters" in these bills was more narrowly defined and permission to construct a project on a nonnavigable stream was granted. Earlier bills include S. 1419, 65th Cong., 1st Sess.; H. R. 3184, 66th Cong., 1st Sess. See 56 Cong. Rec. 8917, 9038; 57 Cong. Rec. 4638; 58 Cong. Rec. 2032.

[20] The following are representative:

"Stripped of its covering, the proposal relates not to commerce between the States or with foreign nations, but it authorizes a commission to issue licenses to corporations and to individuals to build dams and to erect power houses for the generation of electricity for industrial purposes. And in this purpose may be found the explanation of the strained effort to enlarge the definition of 'navigable waters' beyond its proper limits. The proponents of this legislation are not concerned with navigation and so with navigable waters in fact. Theirs is a scheme of power development for the demands and the profits of industry under Federal control. They recognize the impracticability of such developments upon streams navigable in fact and in law, except under unusual and exceptional conditions. . . . Limit this definition of 'navigable waters' as we may and the bill even then will go to the very verge of constitutional inhibition. I know of no authority in our fundamental law for the licensing by Congress of corporations and individuals for the building of dams, the erection of power houses, and the generation of electricity for industrial and commercial purposes. There are those who profess to believe that this may be done upon navigable streams as an incident to the improvement of navigation. Whether this view be sound or not, it is clear in my mind that such powers can not be exercised by

Since the opponents of the Act mounted a major attack on the federal power over navigation, and this was a well-recognized basis of Commerce Clause authority, the proponents defended on this ground. Navigation and federal power over it hence permeated the debates, and statements reflecting the understandings and disagree-

---

the Federal Government within the limits of our States upon streams which are not navigable and over which Congress has no jurisdiction. . . ." 59 Cong. Rec. 6531 (remarks of Representative White).

"As a matter of law, aside from purposes of navigation, the use of the water in the different streams of the several States belongs to the people of those States and not to the Federal Government. The argument insisted upon amounts to this: That the Federal Government is to sell and to make a charge for water that does not belong to it, but which belongs to the people of the States." 59 Cong. Rec. 1430 (remarks of Senator Nelson).

"Mr. KING. Obviously, then, under the Senator's contention, the Federal Government would have jurisdiction over the snow line, and, as the Senator from Colorado [Mr. Thomas] sotto voce says, it would have jurisdiction of the clouds which produce the snow which melts and produces the spring which produces the tributary flowing into the river which is navigable. So that the Federal Government may stretch out its powerful and omnipotent hand until it can grasp the snow in the mountains and say, 'We have jurisdiction over that.'

"Mr. NELSON. That is a forced construction.

"Mr. KING. I think that the Senator's position leads to that.

"Mr. NELSON. It does not lead to that, and that is not my position. The Senator a few moments ago referred to the Rio Grande case. The court intimated incidentally in that opinion that the control of Congress extended to the feeders of the stream, but when it comes to applying the principles of law to the facts in each case they must be measured by the facts. The court did not mean to decide that the feeders were navigable. What the court meant to say was that the Federal Government has sufficient jurisdiction over the feeders to see to it that the supply of water shall not be destroyed or so diminished in the feeders as to prevent the main stream from being navigable. . . .

". . . Does the diversion of the water of a certain feeder of a certain stream for irrigation purposes diminish the quantity of the water to such an extent as to destroy the navigability of the main stream? If the diversion of the water did not diminish the navigability of the

ments over these issues understandably constitute a considerable part of the context in which the Act was enacted.

But none of this history can fairly be said to meet, much less determine, the question presented here. That question is not whether Congress exercised its authority over navigation in the Federal Water Power Act, which it most assuredly did, but whether in enacting § 23 (b) it also invoked its full Commerce Clause authority over hydroelectric projects located on waters subject to federal jurisdiction. The fact that there were debates over the extent of federal power over navigation, or over navigable or nonnavigable streams, sheds little light on whether Congress did, or did not, intend to rely on other aspects of its power over commerce when it directed a Commission determination of the effects of a proposed project on the "interests of commerce." It is true that the debates on § 23 (b), taking the course that they did, contain no express references to interstate commerce in electrical energy, perhaps because the authority to regulate the production of goods destined for interstate shipment was far less defined and understood at that time, see *Hammer* v. *Dagenhart,* 247 U. S. 251, decided in 1918, and perhaps because no one was inclined to inject other constitutional issues into the ongoing debates.[21] But the

main stream, the Government would have no control whatever. Furthermore, it would only have control to the extent of the supply of water needed to subserve the purposes of real navigation.

"We are not seeking to interfere with the present situation, and no matter what we put into this bill, if the Senator from Maine will excuse me a moment longer, we can not change the decisions of the Supreme Court as to their determination of the words 'navigable stream.' We could not undo by this legislation, if we should make the effort, what they have decided. We have made no such attempt." 59 Cong. Rec. 7730.

See also 59 Cong. Rec. 1041–1042, 1472, 7723–7730. Cf. 57 Cong. Rec. 4636–4638, 56 Cong. Rec. 9038.

[21] Especially an issue that was largely theoretical at the time. Prior to the use of the pumped storage technique, hydroelectric

Act which emerged from these debates, and § 23 (b) in particular, was couched in terms which reached beyond the control of navigation and forms no support for the proposition that Congress intended to equate the "interests of commerce" with those of navigation.[22]

Indeed, this history indicates that Congress was differentiating between the two. The House version of § 23 (b) granted permission to construct a dam on a nonnavigable stream and provided for a license if the Commission found the improvement justified for the purpose of improving or developing the waterway "for the use or benefit of navigation in interstate or foreign commerce." [23] The Senate Committee, along with the expansion of the definition of navigable waters, amended this to require the Commission to make an immediate investigation and to prohibit the construction without a license if the Commission found that "the interests of interstate or foreign commerce would be affected." [24] Only if the Commission did not so find was the declarant granted permission to construct upon compliance with state laws. No one offered any explanation for the substitution of the inclusive term "affect the interests of interstate commerce." [25]

---

projects sufficiently large to serve interstate markets were on the interrupting falls, shallows, and rapids of the navigable mainstream or utilized enough water to affect the flow or level of navigable portions.

[22] Indeed, Congress not only invoked its powers over commerce in § 23 (b) but also drew upon its powers over public lands and reservations. Only if there is no effect on commerce and "if no public lands or reservations are affected" is permission granted to construct without a license.

[23] H. R. 3184, 66th Cong., 1st Sess. See also S. 1419, 65th Cong., 1st Sess.

[24] S. Rep. No. 180, 66th Cong., 1st Sess., 19.

[25] *Ibid.*, H. R. Rep. No. 910, 66th Cong., 2d Sess. The House managers did state in a separate statement in regard to the Senate amendment:

"This amendment seeks to prescribe how a stream of doubtful navi-

But conservationists and opponents seemed to agree that the Act embodied the full measure of Congress' authority under the Commerce Clause to regulate hydroelectric projects.[26]   And there is no evidence that the sponsors of the Act, who prevailed in securing its enactment in the broad terms they drafted; intended a construction of interstate or foreign commerce narrower than their constitutional counterparts.   In the face of numerous objections to this exercise of federal authority, we find it of compelling significance that the Congress adopted comprehensive language and refrained from writing any limitation or reference to navigation into § 23 (b).

The materials concerning the 1935 amendments do not alter our conclusion.   Here the hearings and reports contained references to navigation and to the federal authority over navigable and nonnavigable streams.[27]   The House Report, for example, stated that "every person intending to construct a project which might affect navigation would be required to come to the Commission for a determination of the interests of the United States." H. R. Rep. No. 1318, 74th Cong., 1st Sess., 26.   To the same effect, see S. Rep. No. 621, 74th Cong., 1st Sess.,

gability may be determined as within the provisions of the law, and in substance it provides that the commission shall ascertain whether the interests of commerce are affected; if not, then permission is granted to construct in accordance with the State laws." *Id.,* at 13.

But whatever the scope of § 23 (b), the provision was meant to do more than afford a method for obtaining a determination of the navigability of the stream on which the project was to be located. It applies only if the stream is a nonnavigable stream over which Congress has jurisdiction and the Commission is to determine the effect of the project on commerce, not the nature of the stream.

[26] See, *e. g.,* 58 Cong. Rec. 1935; 59 Cong. Rec. 241–244, 1173–1174, 1472, 6529–6531, 7723–7729.

[27] See Hearings before the House Committee on Interstate and Foreign Commerce on H. R. 5423, 74th Cong., 1st Sess., at 383–391, 471–490; S. Rep. No. 621, 74th Cong., 1st Sess., 46–47; H. R. Rep. No. 1318, 74th Cong., 1st Sess., 25–26.

46–47. Such statements clearly refer to the filing requirement of § 23 (b), which was the subject of the committee amendment. Only persons constructing projects on nonnavigable feeders of navigable waters need file a declaration of intention. The committee statements are thus quite accurate in this respect, but they do not illuminate the licensing provision of § 23 (b), as distinct from its filing requirement, nor do they resolve the issue of which projects among those which might affect navigation are required to be licensed. They do not, explicitly or implicitly, exempt from licensing those projects having no effect on navigation. The reports do not equate the "interests of commerce" with those of water transportation.

It is true that there are no express references in the reports or the debates to other aspects of the commerce power in connection with § 23 (b), but the reports reflect the same broad intent as the earlier deliberations to secure federal control over all water power projects involving the utilization of the Nation's river systems.

> "The act would be greatly strengthened by enabling the Commission to preserve control over all projects with which the Federal Government has any valid concern." S. Rep. No. 621, 74th Cong., 1st Sess., 47.

See also H. R. Rep. No. 1318, 74th Cong., 1st Sess., 26. And on the floor of Congress objections to federal control over projects on nonnavigable streams, similar to those voiced in 1920, were again rejected as inconsistent with effective water power regulation. 79 Cong. Rec. 10568. Moreover, there was promptly eliminated an amendment to § 23 which would have required a license only when the "interests of interstate or foreign commerce would be directly affected or burdened by such proposed construction." [28]

---

[28] The amendment was proposed by Senator Pittman and adopted by the Senate without discussion. 79 Cong. Rec. 9053. It was de-

Nor can we ignore the actual effect of the filing requirement added in 1935. The applicable provision prior to this amendment, § 9 of the Rivers and Harbors Act, 30 Stat. 1151, forbidding obstructions to navigation, was adequate to insure that projects with a substantial effect on downstream navigability would be brought before the Commission. Persons intending to construct a project which would likely have no such effect, such as some pure pumped storage installations, could decline to file a declaration of intention with impunity. Thus the 1935 amendment made a difference principally in regard to projects which predictably have little, if any, effect on navigation but a significant effect on interstate commerce. Respondent would have us assume this difference was not intended, although both the Committees stated that the amendment would enable "the Commission to preserve control over all projects with which the Federal Government has any valid concern." S. Rep. No. 621, 74th Cong., 1st Sess., 47; H. R. Rep. No. 1318, 74th Cong., 1st Sess., 26. In light of the necessary purport of this amendment and the breadth of the federal interest in hydroelectric projects expressed in the 1920 Act, the preoccupation of the Commission and the committees with navigation, while not without significance, does not overcome the clear import of the language and the purposes of the Act.

The respondent asserts that an anomalous consequence flows from the Commission's construction of the Act and its view that steam plants generating large amounts of energy for interstate transmission are not within the scope of § 23 (b), although located along a stream over which Congress has jurisdiction. Since the Commission's jurisdiction here rests solely on the interstate transmission of energy, there can be no basis for distinguishing

---

leted by the House Committee, also without explanation. H. R. Rep. No. 1318, 74th Cong., 1st Sess., 42. The Senate agreed. 79 Cong. Rec. 14473.

between a steam plant and a hydroelectric facility both generating energy for interstate use. The Court of Appeals, after noting that the generation of electric energy is a local or intrastate activity, concluded from this argument that "[t]he Commission's jurisdiction . . . must logically rest upon its delegated congressional jurisdiction over the interests of commerce on navigable waters." 326 F. 2d, at 551. On this reasoning either the Act should, but does not, require a license for a steam plant when situated on the navigable mainstream itself, or should not, but does, require a license for a hydroelectric plant, pumped storage or otherwise, situated on the mainstream. but which has no demonstrable effect, or a beneficial effect, on navigability. The answer to this conundrum is that unlike Part II of Title II of the Public Utility Act of 1935, under which the Commission regulates various aspects of the sale and transmission of energy in interstate commerce, Part I, the original Federal Water Power Act, is concerned with the utilization of water resources and particularly the power potential in water. In relation to this central concern of the Act,[29] the distinction between a hydroelectric project and a steam plant is obvious, and meaningful, although both produce energy for interstate transmission.[30]

*Reversed.*

---

[29] Respondent notes that if the use of water resources is at the heart of the matter, then it cannot be explained why the Act differentiates between two precisely similar hydroelectric plants on a nonnavigable stream subject to federal jurisdiction solely because one transmits energy in interstate commerce and the other generates for local use. We fail to perceive the difficulty. The project located on a nonnavigable stream, without any effect on navigability and water commerce and without any interstate sales, may well have no effect on commerce among the States and thus be beyond the power of Congress under the Commerce Clause.

[30] The Court of Appeals noted that the Commission's novel construction "represents a decided departure from its administrative construction of [the] statute" and "one not based upon generally

MR. JUSTICE GOLDBERG, with whom MR. JUSTICE HARLAN and MR. JUSTICE STEWART join, dissenting.

I agree with the Court that there "is no question that the interstate transmission of electric energy is fully subject to the commerce powers of Congress," and that proj-

acknowledged limits of jurisdiction adhered to throughout the years." 326 F. 2d, at 552. Congress must be deemed to have accepted this consistently held administrative view.

It is true that the FPC has not previously required a license for hydroelectric projects generating for interstate markets, but having no effect on navigability, but the existence of such projects in any number may be doubted. The construction of pure pumped storage installations on small streams is a relatively recent development. Thus pure pumped storage projects were not of significance to the federal interest in hydroelectric plants in the early days of the Act.

Further, the FPC's view here is not novel. A Court of Appeals expressly dealt with and rejected this construction of the Act in 1939, *United States* v. *Appalachian Power Co.*, 107 F. 2d 769, 793 (C. A. 4th Cir.). There the Court of Appeals held, in a decision relied on by the court below, that the Commission's construction was untenable "either on the basis of statutory construction or constitutional authority," resting this conclusion in part on a very narrow view of Congress' authority under the Commerce Clause over hydroelectric projects, whether on navigable or nonnavigable waters. This Court, although finding the stream in question navigable, rejected this underpinning of the Court of Appeals' decision and made quite explicit the broad nature of the federal interest in hydroelectric projects. The Court also expressly put aside the issues posed by the intended interstate sales. 311 U. S. 377. Thus the issue herein presented can fairly be said to have been unsettled and unresolved since that decision, as evidenced by an examiner's ruling in 1954 that a project required a license because it would generate energy for interstate transmission. The Commission followed the earlier Court of Appeals' decision and rejected this ruling in a cursory dictum, the project requiring a license on the more traditional ground of effect on navigability. *California Oregon Power Co.*, 13 F. P. C. 1, 3.

The FPC itself has regarded the question as an open one, stating, in reaching the issue in this case, that "an issue of such importance must not be allowed to go unresolved any longer since there can be little doubt that this country in the years ahead will become over-

ects generating energy for such transmission, whether they use water or steam, "are within the purview of the commerce power, quite without regard to the federal control of tributary streams and navigation." *Ante,* at 94. The basic question here presented, however, is one of statutory interpretation: whether Congress exercised fully its commerce power, requiring licenses of those whose projects, built on nonnavigable streams, affect interstate or foreign commerce *in any way,* or whether Congress wished to require licenses only of those whose projects affect interstate or foreign commerce *on navigable waters.* From the time the provision in question was enacted in 1920 until 1962 the Federal Power Commission believed the latter interpretation to be correct and did not attempt to require a license unless commerce on navigable waters was affected. In 1962, however, the Commission "ruled for the first time that [a] hydroelectric project to be constructed in and to utilize nonnavigable waters for the purpose of developing power for interstate use . . . cannot be constructed without an FPC license . . . because it would affect the interests of interstate commerce since the power would be used to supply markets in [other States]." "New Regulatory Policies," Forty-second Annual Report of the Federal Power Commission 23 (1962).[1]  I believe that the Commission's earlier interpretation, con-

whelmingly more dependent upon the maximum development of its water resources in all their uses." 27 F. P. C. 801, 806–807.

We do not find in these circumstances a generally acknowledged jurisdictional limitation or a consistently held administrative interpretation. See *American Trucking Assns.* v. *United States,* 344 U. S. 298.

[1] Moreover, in 1935 Congress re-enacted the relevant statutory provisions. The long-standing administrative interpretation of the licensing provision both before and after its re-enactment is an important factor in construing the statute. See, *e. g., Helvering* v. *Reynolds,* 313 U. S. 428, 432; *Commissioner* v. *Noel,* 380 U. S. 678; 1 Davis, Administrative Law § 5.07 (1958).

sistently followed for many years, correctly reflected congressional intent.

The Court's conclusion, supporting the Commission's new theory that a license is required if a project affects the interests of interstate or foreign commerce in any way seems to be based upon an overly literal reading of the statute. The statute provides that a license is required if the Commission finds that "the interests of interstate or foreign commerce would be affected by such proposed construction." With all deference, I do not believe that the interpretation of the Court and the Commission that this language establishes that Congress intended to exercise the full reach of its commerce power can be maintained, for the legislative history of this provision clearly reveals that the "interests of . . . commerce" to which Congress refers are the interests of commerce on navigable waters. Statements by congressional proponents of the Federal Water Power Act and others, when the Act was first enacted in 1920, make clear an intent that licensing be required only when interests of commerce on navigable waters are affected.[2] Moreover, after a considerable period during which the Commission consistently interpreted the licensing provision in accordance with this congressional intent, the statute was re-enacted in 1935. At that time statements of the drafters of the Act [3] and the Senate and House Reports on the Act [4] again clearly indi-

---

[2] See Appendix A. See also 56 Cong. Rec. 8917, 9038; 57 Cong. Rec. 4638–4639; 59 Cong. Rec. 6529–6531, 7723, 7725, 7730.

[3] See Appendix B.

[4] Both the Senate and House Reports on the 1935 amendments to the Federal Water Power Act make clear that the licensing provision was to apply where navigable waters are affected. The Senate Report states: "Under this subsection with the two amendments here made every person intending to construct a project which might conceivably affect any navigable waters would be under the duty of coming to the Commission." S. Rep. No. 621, 74th Cong., 1st Sess., 47. The House Report expresses similar views. H. R. Rep. No. 1318, 74th Cong., 1st Sess., 25–26.

cated an intent to have the licensing requirement apply only when a project affects interests of commerce on navigable waters.

It may well be, as the Court intimates, that some of the Act's proponents believed that Congress constitutionally could require licensing only where navigable waters are affected.[5] If the legislative history showed an intent to exercise the commerce power to its full extent, notwithstanding doubts as to the reach of this power, I would accept the reading of the statute given by the Court. However, the history, in my view, reveals an express congressional intent to limit the application of the licensing provision to navigable waters irrespective of the scope of the commerce power. There is no indication that anyone envisaged or desired the application of the licensing provision to the type of project here involved which affects interstate commerce only because the electricity produced crosses state lines.

Moreover, to interpret the provision as the Court does today produces a substantial anomaly, for steam generating plants that affect interstate commerce in a manner identical to that of hydroelectric plants such as the one involved here would not be required to obtain a license from the Commission, yet hydroelectric plants would have to obtain one. The Court attempts to explain away this anomaly, by stating that in view of the original Federal Water Power Act's concern with "the power potential in water," "the distinction between a hydroelectric project and a steam plant is obvious, and meaningful, although both produce energy for interstate transmission." *Ante,* at 110. However, even in terms of the "power potential in water," I fail to find a relevant distinction between a plant which artificially pumps water to an elevated reservoir in off-peak periods allowing it to fall and generate

_____

[5] See n. 2, *supra.*

electricity at peak periods and a plant which heats water to create steam which generates electricity. I see no purpose of the Act that justifies producing this anomaly in the regulatory scheme. Under my view, of course, when interstate or foreign commerce is affected, Congress can constitutionally require licenses of both steam and hydroelectric projects, of either steam or hydroelectric projects, or of neither. The legislative history here, however, establishes to my satisfaction that it has required licenses of neither steam plants nor the type of hydroelectric plant here involved, and in light of this legislative history I agree with the Court of Appeals that Congress intended that a license be required only where the interests of commerce on navigable waters are affected.[6]

## APPENDIX A TO OPINION OF MR. JUSTICE GOLDBERG, DISSENTING.

Excerpts from Senate debate on May 27, 1920, 59 Cong. Rec. 7730.

"Mr. KING. This bill, as I interpret it, would make every stream navigable, even to the headwaters of the smallest stream, or up to the snow line, where the snow melts and finds its way by little trickles and rivulets into some other stream. For instance, this language, if the Senator will pardon me——

"Mr. NELSON. Let me call the attention of the Senator to the first part of the amendment, which reads:

" 'Navigable waters' means those parts of streams or other bodies of water over which Congress has jurisdiction under its authority to regu-

---

[6] In light of the majority decision in this case, I do not feel it necessary to deal with the Court of Appeals determination that the Commission erred in finding that the hydroelectric project here involved affected navigable waters.

late commerce with foreign nations and among the several States——

"Mr. KING. The Senator will see that that does not impose any limitation upon the Federal Government as to what it may regulate. When it confers the power to regulate commerce among the States, et cetera, that is not a definition of what commerce is or the extent to which Congress may control streams. The Supreme Court has held, as I understand, that tributaries of tributaries of other tributaries, if any part of such tributary of the final stream was navigable, would be under the cognizance of the Federal Government. That would carry up to the snow line.

"Mr. NELSON. The court's decision only goes to this extent—and the facts in the case must be considered—that as to the tributaries that supply water to the main stream, which is in fact and in law navigable, Congress of necessity must have sufficient jurisdiction over those feeders to prevent their being dammed up and thereby preventing the supply of water running into the main stream. That is the extent of the decision and the Senator ought to see that that is inevitable, for if all the feeders of our great rivers, such as the Mississippi, the Missouri, and other navigable rivers, could be dammed up so that water would be kept away from them they would cease to be navigable.

"Mr. KING. I am not arguing that question.

"Mr. NELSON. So the Government has jurisdiction to the extent that the supply of water can not be cut off from a navigable stream.

"Mr. KING. Obviously, then, under the Senator's contention, the Federal Government would have jurisdiction over the snow line, and, as the Senator from Colorado (Mr. Thomas) sotto voce says, it

would have jurisdiction of the clouds which produce the snow which melts and produces the spring which produces the tributary flowing into the river which is navigable. So that the Federal Government may stretch out its powerful and omnipotent hand until it can grasp the snow in the mountains and say, 'We have jurisdiction over that.'

"Mr. NELSON. That is a forced construction.

"Mr. KING. I think that the Senator's position leads to that.

"Mr. NELSON. It does not lead to that, and that is not my position. *The Senator a few moments ago referred to the Rio Grande case. The court intimated incidentally in that opinion that the control of Congress extended to the feeders of the stream, but when it comes to applying the principles of law to the facts in each case they must be measured by the facts. The court did not mean to decide that the feeders were navigable. What the court meant to say was that the Federal Government has sufficient jurisdiction over the feeders to see to it that the supply of water shall not be destroyed or so diminished in the feeders as to prevent the main stream from being navigable.* The Senator on reflection ought to see that if the Government had no control whatever of the feeders—if such a thing were possible, although I can not conceive it—if it were possible for the States or individuals to dam up the feeders and prevent a drop of water flowing into the main navigable stream, they could dry up the main stream and destroy navigation on it. Except in those sections where the water is exhausted for irrigation, the erection of dams in feeders, as a matter of fact, for instance, in the East and in the Middle West, does not diminish the supply of water, for the water flows over the dam in one way or another and enters the

feeders and then the main stream. It is only in the arid West where it is possible to divert water entirely for irrigation purposes from the main stream.

"To what extent can that be done? I take it that if a case of that kind should come before the court, the court would consider both the rights of the farmers, who needed the water for irrigation, *and the interests of commerce requiring water for navigation,* and the question would be one of fact in each case. Does the diversion of the water of a certain feeder of a certain stream for irrigation purposes diminish the quantity of the water to such an extent as to destroy the navigability of the main stream? *If the diversion of the water did not diminish the navigability of the main stream, the Government would have no control whatever. Furthermore, it would only have control to the extent of the supply of water needed to subserve the purposes of real navigation.*

"We are not seeking to interfere with the present situation, and no matter what we put into this bill, if the Senator from Maine will excuse me a moment longer, we can not change the decisions of the Supreme Court as to their determination of the words 'navigable stream.' We could not undo by this legislation, if we should make the effort, what they have decided. We have made no such attempt. We have simply said that those parts of streams or bodies of water over which Congress has jurisdiction under its authority to regulate commerce with foreign nations and among the several States, and which in either their natural or improved conditions, and so forth, are navigable, shall be considered to be navigable streams. That is all we have said. We have simply left the matter where the courts have left it; and if we undertook to change the law as it is and to

say that a certain class of streams which are navigable in fact are not navigable the Supreme Court would overrule us." (Emphasis added.)

## APPENDIX B TO OPINION OF MR. JUSTICE GOLDBERG, DISSENTING.

A memorandum prepared by the Federal Power Commission and submitted to the House Committee on Interstate and Foreign Commerce explaining the amendments to the Federal Water Power Act states:

"Section 210 of the bill amends section 23 of the Water Power Act. . . . In subsection (b) the present provision that those intending to undertake projects on a nonnavigable tributary of a navigable stream may in their discretion file declaration of such intention with the Commission is changed so as to make it a duty to file such a declaration before proceeding with the construction, maintenance or operation of any project on such waters. Furthermore, a provision is inserted expressly making it unlawful to construct a project on any navigable waters without a license granted pursuant to the act. This latter provision is in substance the result achieved by the River and Harbor Act of 1899 when read with the Water Power Act. It is thought desirable to bring together the regulations dealing with power projects in a single act. *Under this section as amended, every person intending to construct a project which might conceivably affect any navigable waters would be under the duty of coming to the Commission. The act would be greatly strengthened by enabling the Commission to preserve control over all projects with which the Federal Government has any valid concern.*" Hearings before the House Committee on Interstate and Foreign Commerce, 74th Cong., 1st Sess., 391. (Emphasis added.)

Dozier DeVane, Solicitor for the Federal Power Commission, testified as follows concerning the amendments which the Commission had prepared:

"Mr. MARTIN. Although it may be rather in the form of repetition, the memorandum impresses me that the contention of Mr. Mapes in section 3 is broader, from the standpoint of commerce in the way of a power, than the language in section 4.

"It occurred to me that you could just leave those words 'navigable waters in the United States' in the section and then add as defined in section 3.

"Mr. DEVANE. No, sir; what we are attempting to do is to make it clear that the Commission has the authority to issue [a] license under section 4 in cases that arise under section 23 of the act.

"Mr. MARTIN. The addition of the words defined in section 3, added to 'navigable waters of the United States,' however, would incorporate the section 3 definition of navigable waters.

"Mr. DEVANE. Of course, we think it exists without that amendment.

"Mr. Ryan calls my attention to the fact that section 3 might be considered to apply only to navigable waters, while section 23 applies to nonnavigable waters as well.

"The jurisdiction of Congress extends beyond the navigable waters. *It extends to nonnavigable waters where anything you do in those rivers or streams might affect navigation and those are the cases which fall under section 23 of the act.*

"Mr. CROSSER. What was that last statement? I did not quite hear it.

"Mr. DEVANE. *Section 23 applies to nonnavigable waters, where anything that is done in those waters might affect interstate or foreign commerce.*

"The CHAIRMAN. I think the committee has your position on that. You may pass on.

. . . . .

"Mr. MAPES. Does the Commission arrive at its conclusion, reach about the same conclusion, as to whether a plant should obtain the license or not, as Congress and the Board of Engineers do when they determine that a stream is navigable and that, therefore, people who desire to build a bridge across it, must get the consent of Congress to do it?

"Mr. DEVANE. The Commission in the first instance refers these declarations of intention to the War Department, the Engineer Corps of the War Department, and an investigation and recommendation is made by that Department, with reference to the effect upon interstate or foreign commerce, and the Commission, if it is necessary after that investigation and report is made, holds hearings, takes evidence, and makes its findings.

"The Commission attempts to act according to the facts as they are shown. In very few of the cases is there ever any controversy.

"Mr. MAPES. *Are these two expressions synonymous, or not: the effect upon interstate commerce, and the navigability of a stream?*

"Mr. DEVANE. *Mr. Mapes, I think they are. Do you want to hear argument on the other side as to whether they are or not?*

"Mr. MAPES. *No.*

"Mr. DEVANE. I see that you have some knowledge at least of the fact that that question has been debated, but to me it is a question of 'tweedledee and tweedledum.' I cannot take my legal processes to that refinement. There may be a difference; yes, sir. It is conceivable, at least in somebody's mind, that

the construction of a project in a certain stream will not at the time in fact have any effect upon interstate or foreign commerce, but that the construction of the project has a potential possibility of affecting interstate or foreign commerce at some future time which will prevent a man from spending money to put commerce on that stream.

"Now that is the way the argument runs.

.        .        .        .        .

"Mr. DeVane. We are not seeking by any amendment that we propose to enlarge the jurisdiction of the Commission in the waters of the United States over which Congress has control.

"Mr. Holmes. I understood you to say you were, so that you could control other than navigable waters.

"Mr. DeVane. That is the law today.

"Mr. Holmes. Then I misundertoood you in that regard.

"Mr. DeVane. Well, I would like to make that perfectly clear.

"We are not extending the power. We are not proposing any amendment that extends the power of the Commission over any waters of the United States that they do not have power over today—not at all.

.        .        .        .        .

"At this point, Mr. Mapes, I think we might clear up the difficulty that I had in answering a question that you asked me on Saturday.

"You will observe that under subsection (b) of section 23, persons desiring to construct projects in waters over which Congress has jurisdiction, but which may not be looked upon as navigable waters, as such, may come to the Commission under a declaration of intention and have determined in advance of the construction whether or not a license is necessary.

"That provision in section 23 is broader than the language in section 3, where the definition of navigable waters is used, the one that you were asking me about, on Saturday.

"The definition of navigable waters in section 3 applies only to those waters that are in fact navigable.

"Section 23 applies to waters that are not in fact navigable, *but where construction may affect interstate or foreign commerce.*

.        .        .        .        .

"Mr. MAPES. Yes. Has the court sustained the Commission in that respect, the jurisdiction of the Commission?

"Mr. DEVANE. Of nonnavigable waters?

"Mr. MAPES. Yes.

"Mr. DEVANE. You are asking about the jurisdiction of Congress over these nonnavigable waters, that affect navigation?

"Mr. MAPES. Yes.

"Mr. DEVANE. Yes; the jurisdiction of Congress over such streams was upheld in the case of the *United States* v. *Rio Grande Dam & Irrigation Co.,* 174 U. S. 690. That was decided under the Rivers and Harbors Act of 1899, *which in effect is the same as section 23 of this act.*"

.        .        .        .        .

Hearings before the House Committee on Interstate and Foreign Commerce, 74th Cong., 1st Sess., 471–472, 474, 476, 489, 490. (Emphasis added.)