## HARRIS v. CENTRAL NEBRASKA PUBLIC POWER & IRRIGATION DIST.

### No. 312.

District Court, D. Nebraska,
North Platte Division.

Dec. 12, 1938.

426

E. H. Evans and Halligan, McIntosh & Halligan, all of North Platte, Neb., G. J. McGinley, of Ogallala, Neb., and Robert E. Hamer, of Omaha, Neb., for plaintiff.

Beatty, Maupin, Murphy & Davis, of North Platte, Neb., and Paul E. Boslaugh, of Hastings, Neb., for the Power & Irrigation District.

DONOHOE, District Judge.

The defendant, as its name indicates, is a public power and irrigation district, created and chartered under the laws of the State of Nebraska, and will be referred to hereafter as the "Power & Irrigation District". In keeping with the provisions of its organization, the Power & Irrigation District commenced the construction of a project on a large scale on the North Platte River. The construction work was started on March 9, 1936, and has progressed continuously until the present time with marked progress and with a total expenditure to date of $11,478,954.48.

In the course of its progress, it made application in due form to the Federal Power Commission for the purpose of obtaining a federal license under the provisions of The Federal Power Act, section 817, title 16, U.S.C.A. From the report and showing in support thereof submitted with the application, it appeared and the Commission so found that "the operation of the project, as proposed and planned, will result in the storage of flood waters, and the release of impounded waters at a gradual rate, thus

reducing flood flows in the North Platte and Platte Rivers below the project works, and increase low water flows, the result of which will be to make the flows in the Platte River more nearly uniform" and "the operation of the project will result in a reduction of the discharge of sediment from the Platte River into the Missouri River, thus facilitating the maintenance of navigation channels in the Missouri River" and "the licensee may not operate the project in a manner that would adversely affect the interests of interstate commerce except in direct violation of the express terms of the license". From the foregoing showing and the supporting evidence, the Commission made and entered its Findings that "the construction and operation of the project, No. 1417, is in the judgment of the Commission, desirable and justified in the public interest for the purpose of improving or developing the North Platte and Platte Rivers for the use and benefit of interstate commerce on the navigable rivers to which the Platte River is tributory, namely, the Missouri and Mississippi Rivers".

In accordance with this showing and the finding of the Commission, a license in due form was issued to the Power & Irrigation Company, and ever since it has been and is now proceeding with its work in keeping with the terms of the license.

This present action is an action brought by the Power & Irrigation Company for the condemnation of certain lands lying within the bed of the reservoir, which is in process of construction, under the provisions of Section 814, title 16, U.S.C.A. of the Federal Power Act. Appraisers were heretofore appointed, as by law provided, and from their appraisal an appeal has been prosecuted to this Court. The landowner has filed his motion to dismiss, among other things, challenging the jurisdiction of the Court, and setting up some twenty-one grounds of objection, many of which objections, to our mind, might only be raised by the sovereign state from whom the Power & Irrigation Company derived its charter, and seemingly upon which the landowner is placing little if any reliance in view of the statement of counsel for the landowner made upon the opening of the oral argument and after the hearing, which I quote:

"I think at the outset, it perhaps would be well and would tend to clarify the issues if it is made clear that the landowners in this proceedings are not in this Court seeking to annul, set aside or suspend the license granted by the Federal Power Commission to the Tri-County project, except insofar as that license confers the right to institute eminent domain proceedings in this Court, and insofar as that license, as such, confers the right of eminent domain on this District. (meaning the Power & Irrigation District) The Federal Power Commission and the United States are not parties to this proceeding. They do not represent the parties. They are not necessary parties. The only thing we are seeking here is an adjudication of the right of this District (meaning the Power & Irrigation District) to condemn under that license. We are not seeking an adjudication with respect to the validity of any of the conditions or provisions of this license, but merely with respect to a right, which this District (meaning the Power & Irrigation District) has asserted, growing out of that license, to-wit: the right to institute eminent domain proceedings by virtue of being a licensee."

Then the following colloquy with the presiding judge took place:

"The Court: Are you questioning the right of eminent domain proceedings in the State Court?

"Mr. Hamer: No, your Honor, we concede that the District has a right to institute eminent domain proceedings in the State Court, but not by virtue of its license but by virtue of the express conditions and provisions of the statute under which it was created—a right given them by the Legislature of the State of Nebraska.

"The Court: Then the only question involved here is whether or not proceedings shall be instituted in the Federal Court or the State Court?

"Mr. Hamer: That is right, your Honor."

From this statement of the objection, as defined by counsel, we are first confronted with the proposition of what jurisdiction this Court has to review the evidence presented to the Federal Power Commission on the application for license. If the license is valid for any purpose, it would seem that it must be valid for all purposes, while if the license is void for any purpose, then it would likewise seem to be void for all purposes. This is an action between the landowner and the Power & Irrigation District. The United States and the Federal Power Commission are not made parties. Counsel says they are not

necessary parties. How may we determine whether the license is void without their presence? Before we might hold that we are without jurisdiction in this case to decide the condemnation suit, we must first set aside and annul the license granted by the Federal Power Commission, and to annul and set aside an Order of a Commission of the United States requires the presence of the United States—that is, the action must be brought against the United States. This principle is so well recognized· and has been announced on so many different occasions by the Courts that I do not deem any extensive citation of authorities necessary—suffice for our purpose—Venner v. Michigan Central Railroad Company, 271 U.S. 127, 128, 46 S.Ct. 444, 70 L.Ed. 868.

This is a collateral attack on an order of the Federal Power Commission. The Federal Power Act, among other provisions, affords ample opportunity for every interested party to be heard before the Commission before the license is issued. By Section 313 (a), 16 U.S.C.A. § 825l, any person aggrieved by an order issued by the Commission in a proceeding under the Act may appear and become a party by intervention, and apply for a re-hearing within thirty days after the issuance of such an order, and may obtain a review in the Circuit Court of Appeals of the United States for any Circuit wherein the licensee is located by filing, within sixty days after the order upon the application for re-hearing, a petition praying that the order may be modified or set aside in whole or in part. Such proceedings were disregarded by the landowner in this case. We think they had an opportunity to be heard on the issue which they now raise, but of which they did not avail themselves.

The license granted was in accord with the law. It was within the power of the Commission. It was issued after a showing made, and findings of fact duly entered. May this Court, given no jurisdiction in the Act itself to review, in this collateral proceeding now try the matter de novo? We think not, and so hold.

The cases relied upon by counsel are cases mostly where the United States was a party, and are mostly injunction suits, in which injunctive relief was sought against the enforcement of the orders of the Commission. This is no such proceeding. The landowner does not claim the violation of any constitutional right. There is no claim made that the provision for eminent domain will deprive him of his property without due compensation. No constitutional right is invaded and consequently there is not present any question that would ordinarily warrant this Court to interpose its judgment or order for the preservation of the constitutional rights of litigants.

Aside from the foregoing consideration, we are persuaded that the Federal Power Commission acted clearly within its jurisdiction in issuing the license. At the commencement of the hearing on the motion in this case, we felt justified in taking evidence for the purpose of determining whether the findings of the Commission as to the facts was supported by substantial evidence in order that such finding should be conclusive; as the law provided· Far beyond my expectations, a mass of evidence in the form of computations, tables, maps, scientific data, figures and more figures, were presented by engineers on both sides, all of which is of very little assistance to the Court except on the single proposition of how or in what manner the interest of interstate or foreign commerce would be affected by the proposed construction. I may say that the engineers are in decided disagreement. They do not start from the same place. One set uses as a basis for their computations a stated volume of water discharged over the state line from Wyoming. The other set of engineers disregard this calculation and use a different volume as the basis for their computations. All of which persuades the Court that finite minds are disposed to formulate opinions from their own measurements and calculations without taking into consideration the power, the will, and the purpose of the Infinite. Seasons and climate, rainfall and snow, change and come at unexpected and unknown intervals. What happens today may not happen to-morrow, and what occurred last year may not occur this year. What we do know is that we have a great water basin extending from the Rocky Mountains to the Missouri River, covering thousands of acres, and that at frequent intervals great quantities of moisture fall, and are gathered into the basin and carried off to the sea.

The Federal Power Commission and this Court, in considering the questions presented, are not confined to the calculations of engineers. We take judicial notice of what we see around us. The engineers seemingly base their calculations on the fact that in order for these rivers to come within the jurisdiction of the

Congress, that the affectation of interstate commerce must be constant and continuous. I can read no such provision in the statute. Those of us who for so many years have lived along the Platte River know of the large volume of waters that are released intermittently and unexpectedly due to "water spouts" and "sudden thaws", which at times overflow the valley, many of which are sufficient in themselves to destroy or greatly impair the structure in the Missouri River now in progress of completion. The whole plan and purpose of this project is to pick up, store and hold back these floods. That these waters carry great quantities of silt and debris is a matter of common knowledge. This silt and debris is deposited in the Missouri River and must necessarily find its place in the channel erected for navigation. I am well aware that some judges have held that streams such as the North Platte are not subject to the jurisdiction of the Power Commission, and have persuaded themselves by a line of reasoning which to me is not persuasive. I am unable to satisfy my mind in a determination of when a river, once determined to be navigable, ceases to be affected by its upper reaches in gathering the waters for its flow. I can readily understand, as was stated by Justice Brewer in the Rio Grande case, United States v. Rio Grande Dam & Irrigation Co., 174 U.S. 690, 19 S.Ct. 770, 43 L.Ed. 1136, that there is a place where the Court will take judicial notice from matters of general knowledge where the river ceases to be navigable, and where evidence is required to extend the point beyond such place, but I cannot conceive of any competent evidence that might be adduced to establish that water flowing from the upper reaches would not affect that point of navigability. We know historically, and from such take judicial notice, that in the early history of Nebraska, the Missouri River was navigable to Fort Peck and beyond, but that with the coming of better means of transportation, navigation was abandoned and that there was practically no navigation on the Missouri River as far as Omaha until the construction of the recent controlled channel. Who can say at what point and when that navigation ceased or at what point and when did the waters flowing into the Missouri River cease to affect navigation?

 But it is contended in this case that the purpose of the development is not for the purpose of serving navigation but is to serve other purposes—that is to produce power and irrigation for a large tract of land. The fact that other purposes than navigation is also to be served, as stated in the case of Arizona v. California, 283 U. S. 423, 456, 51 S.Ct. 522, 526, 75 L.Ed. 1154, "could not invalidate the exercise of the authority conferred, even if those other purposes would not alone have justified an exercise of Congressional power". When the Congress of the United States delegated to the Federal Power Commission power and authority to regulate, under restrictions in the Act provided, waters that affect navigation, it will not be presumed that Congress in so doing was actuated solely by an attempt to regulate power and irrigation plants, as such, for, as stated by Judge Brandeis in the opinion in the Arizona case, supra: "This court may not assume that Congress had no purpose to aid navigation, and that its real intention was that the stored water shall be so used as to defeat the declared primary purpose. Moreover, unless and until the stored water, which will consist largely of flood waters now wasted, is consumed in new irrigation projects or in domestic use, substantially all of it will be available for the improvement of navigation. The possible abuse of the power to regulate navigation is not an argument against its existence." (Citing a number of cases).

It follows necessarily that this Court will not presume that when the Federal Power Commission issued its license upon a showing that included in its purpose the development of power and irrigation—purposes other than navigation—that the Commission thereby had no purpose to aid navigation, and that its real and only purpose was to aid power projects and irrigation. This clearly answers the argument of the landowner that when the demands of irrigation and power are supplied, there will be no water available to aid navigation in the Missouri River. We have no right or reason to assume that this project will be operated except in the manner indicated in its application, and in which flood waters will be controlled and navigation thereby served.

 Consequently, aside from our holding that the landowner may not in this action collaterally attack the order of the Federal Power Commission, since the Congress has preserved in the Act the Federal judicial power in review of proceedings, and there is no question of substituting administrative agencies for that judicial pow-

430

er—as I say, aside from this holding, we think the evidence clearly establishes that the finding of the Federal Power Commission was based on substantial evidence as shown by the facts in this case, and that even in a direct appeal it would not be disturbed.

The motion to dismiss will therefore be denied.