661 P.2d 741

**IDAHO POWER COMPANY,**
Plaintiff-Appellant-Cross-Respondent,

v.

The STATE of Idaho, acting By and Through the DEPARTMENT OF WATER RESOURCES, the Idaho Water Resource Board, and its Executive Director, C. Stephen Allred, in his official capacity, Defendants-Respondents-Cross-Respondents,

and

The State of Idaho, acting by and through the Idaho Public Utilities Commission, and Commissioners, Robert Lenaghen, Conley Ward, and Ralph Wickberg in their official capacities; and Matthew Mullaney, John Peavey, Charles Hisaw, Diane Plastino, Jeff Fereday, Billie Thompson, L.N. "Bud" Purdy, John Falkner, Bill Arkoosh, Eslie Heinz, Harold Ingram, Ralph Ingram, Harold Huyser, Mary Mech, Gerald Tews, John Bryngelson, Clive Schell, Defendants-Respondents- Cross-Appellants- Cross-Respondents,

and

David Mickelsen, A.W. Molyneux, Morgan & Shillington, a partnership, Defendants-Respondents-Cross-Respondents,

and

Fred Tiede, Gary Tiede, Otto Tiede, James Tiede, Ferdinand Gehring, Melvin Funk, Sid Allen, Jim Pahl, Lenard Schritter, Alfred Fothergill, Marcia Pursley and J.W. Swan, as Complainants in P.U.C. Complaint, Case No. U–1006–124, Defendants-Respondents, Cross-Respondents-Cross-Appellants,

and

Murphy Water Company, Crane Falls Mutual Irrigation Co., Defendants-Respondents-Cross-Respondents,

and

Nelda E. McAndrew, Defendant-Respondent-Cross-Appellant-Cross-Respondent,

and

Pilgram Irrigation Company and Enterprise Acres, Defendants-Respondents-Cross-Respondents,

and

Upper Grand View Canal Company, Defendant-Respondent-Cross-Respondent,

and

Martin K. Slane, and Mountain View Irrigation Company, Inc., aka Yahoo Company, Inc., Ronald H. Warrick, Defendants-Respondents-Cross-Respondents,

and

Cottonwood Canal Company, Defendant-Respondent-Cross-Appellant,

and

John Doe, and the State of Idaho, acting by and through the Department of Fish & Game, acting through its Executive Director Joseph Greenley, in his official capacity; John Peavey, Picabo Livestock, Inc., Faulkner Land & Livestock, Bill Arkoosh, Ralph Ingram, Harold Huyser, Mickelsen Farms, Inc., A.W. Molyneux, Morgan & Shillington Farm Co., a partnership, Fred Tiede, Otto Tiede, Melvin Funk, Jim Pahl, and Lenard Schritter, Defendants-Respondents-Cross-Respondents,

and

Mud Flat Canal Company, Defendant-Respondent-Cross-Appellant-Cross-Respondent.

No. 13794.

Supreme Court of Idaho.

March 31, 1983.

Thomas G. Nelson of Nelson, Rosholt, Robertson, Tolman & Tucker, Twin Falls, for Idaho Power Company.

David H. Leroy, Atty. Gen., Josephine P. Beeman, Howard Carsman, Deputy Attys. Gen., Boise, for C. Stephen Allred, et al.

Phillip Barber, Boise, for Water Resource Bd.

David H. Leroy, Atty. Gen., and Michael S. Gilmore, Deputy Atty. Gen., Boise, for Idaho Public Utilities Com'n.

Jeffrey R. Christenson of Anderson, Kaufman, Ringert & Clark, Boise, for Mud Flat Canal Co., Cottonwood Canal Co., Nelda E. McAndrew and Upper Grand View Canal Co.

Matthew J. Mullaney, Jr., Boise, for Paragraph XX defendants and pro se.

Ben Cavaness, American Falls, for Picabo Livestock.

Severt Swenson, Jr., Gooding, for Faulkner Land & Livestock.

Larry R. Duff of Goodman, Duff & Chisholm, Rupert, for Morgan Shillington Farm Co.

David H. Leroy, Atty. Gen. and John Vehlow, Deputy Atty. Gen., Boise, for Idaho Dept. of Fish & Game.

Lloyd J. Walker, Twin Falls, for Pilgrim Irrigation Co. and Mountain View Irrigation Co., Yahoo Co., Inc.

Jack Murphy, Shoshone.

Fred Stewart, pro se.

## ON DENIAL OF PETITION FOR REHEARING

SHEPARD, Justice.

This case involves a series of appeals from an order of the district court which granted certain motions for summary judgment, disposed of all the issues raised, and constituted a final judgment. Narrowly stated, the case involves the validity of Idaho Power's water rights at its Swan Falls power plant on the Snake River, and the case arose when Idaho Power brought the action seeking a determination of the validity of those water rights, and that they were not subject to future upstream depletion. More broadly stated, the case involves conflicting claims to utilization of the waters of the Snake River between competing interests of power generation and agricultural irrigation. The issues involved are of large significance to the majority of the people of the state. We affirm in part and reverse in part.

The Snake River system rises in the easternmost part of Idaho and the adjoining area and flows westward across the entire breadth of the state. Thereafter it turns northward, forming Idaho's western border, and ultimately falls into the Columbia River, of which it is a principal tributary. Hence, the Snake River and its use has exercised and will continue in the future to exercise an enormous influence over a very substantial portion of Idaho and its people.

The roots of this litigation stretch back to the early days of the state and the background must be set out in some considerable detail. The Trade Dollar Consolidated Mining Company constructed the first hydroelectric dam on the Snake River at the Swan Falls site in 1901. It originally provided power to the mines of the Silver City area, which service was later shifted to the towns which lay to the north. At that time there were a number of small scale companies supplying electric power in that region, and eventually five of those companies came to dominate the electric power supply market for southern Idaho. In 1915 those five companies merged to form Idaho Power Company, and in the merger Idaho Power acquired the Swan Falls dam and power plant, as well as others which had been built in the interim. *See* R. Sessions, *Idaho Power Co.*, 43–54 (1939).

Idaho Power had secured a federal court decree which, together with state water licenses, granted Idaho Power water rights at Swan Falls of 9450 cfs with priority dates ranging from 1900 to 1919. However, it is undisputed that the Swan Falls power plant's hydroelectric capacity is 8400 cfs, and therefore the water rights at Swan Falls are limited to 8400 cfs.

Congress, in 1890, had passed legislation prohibiting construction of obstructions to navigation without the approval of the Secretary of War. 26 Stat. 454 (1890). That legislation was superseded by a provision of the 1899 Rivers and Harbors Act which, in part, made it unlawful to build dams on navigable rivers without the consent of Congress and approval of the plans by the Corps of Engineers and Secretary of the Army. 33 U.S.C. § 401. In 1920 Congress enacted the Federal Water Power Act, now

known as the Federal Power Act, 16 U.S.C. §§ 791a–825r, and thereafter created the Federal Power Commission (FPC) to administer the Act. One of the stated purposes of the FPC was, in conjunction with the Corps of Engineers, to issue licenses for construction and operation of dams and other hydroelectric projects. 16 U.S.C. § 797(e). It does not appear from the record before us that such a license was obtained for Swan Falls until an operating license was granted in 1928. That license by its terms expired in 1970, but annual renewals have kept it in force. The record here reflects only that Idaho Power's application for a new license for Swan Falls is presently pending before the FERC.[1]

Thereafter, in the late 1920s and the 1930s, new dams and improvements on existing facilities were constructed on the Snake River. Following the Second World War, Idaho Power undertook a massive dam building campaign, and between 1948 and 1952 five additional dams (Upper and Lower Malad, Lower Salmon Falls, Bliss, and C.J. Strike) were constructed on the central portion of the Snake River. *See* G. Young & F. Cochrane, *Hydro Era: The Story of Idaho Power Company,* 46–53 (1978).

With the completion of the C.J. Strike dam in 1952, it became apparent that the Snake River was no longer inexhaustible and concerns began to be expressed as to the usage of the remaining finite flow of the river. Reflective perhaps of those concerns were provisions that began to be placed in FPC licenses and in state water licenses, known as "subordination" clauses. Therein water rights of power companies did not contain the customary total priority of right but, rather, would be inferior to future upstream depletion. The validity and scope of those subordination clauses have become the principal issues of this appeal.

The license obtained by Idaho Power in 1928 for operation of the Swan Falls dams and generating facility which was granted by the FPC contained a provision forbidding Idaho Power from objecting to use of water by others, "provided such use will not materially reduce the amount of power produced." The Idaho Power license granted by the FPC for the Twin Falls dam (1934) provided that its water rights were subordinate to present and future irrigation uses, except that Idaho Power could use its water stored at the American Falls reservoir some distance upriver and any water entering the river below Milner dam (approximately half way between Twin Falls dam and American Falls dam), but stated that the license affected water rights at no other point. Of the other licenses granted Idaho Power for dam construction prior to 1952 which appear in the record here, neither FPC project licenses nor state water licenses appear to contain any subordination language.

The FPC license granted Idaho Power in 1928 for operation of the Swan Falls project also provided that the licensee "will, during the period covered by this license, retain possession of all project property ... including ... water rights; and that none of such properties valuable and serviceable to the project ... will be voluntarily sold, transferred, abandoned, or otherwise disposed of without the approval of the Commission." That provision appears to have become a standard form attached to later FPC licenses and appears in the record relating to the licenses for several other dams.

When Idaho Power sought a license for the C.J. Strike project, a subordination clause was sought to be inserted in that license. Idaho Power resisted such efforts for the insertion of the subordination clause in the C.J. Strike license. At that time the

1. The functions of the FPC were transferred to the Secretary of Energy and the Federal Energy Regulatory Commission (FERC) within the Department of Energy, by the Act creating the Department of Energy in 1977. 42 U.S.C. §§ 7151, 7171, 7172(a)(1)(A) and 7172(a)(2)(A). This appeal involves action taken by the FPC long before the creation of the Department of Energy; therefore this opinion will refer throughout to the FPC. To the extent that we discuss the power of the FPC under the Federal Power Act, it follows that such discussion applies to its modern counterpart, the FERC.

federal government had plans for the building of upstream irrigation diversion projects and the then secretary of interior, in light of those plans, sought some form of protection guaranteeing the availability of water for future upstream irrigation. A compromise was reached and in the 1951 license for C.J. Strike dam, provisions were inserted giving the federal government a choice of paying damages or acquiring the C.J. Strike project if federal irrigation projects caused a reduction of power output. We pause to note that, as will later be developed, perfection of water rights depends not only on FPC licenses, but also upon granting of state water licenses. Such state water licenses are not granted until the completion of the project. In 1951, the C.J. Strike project had not been completed, and hence its accompanying state water license application was still pending.

Meanwhile, Len Jordan had been elected governor of Idaho, taking office in 1951, and a major controversy was under way between the federal government and Idaho Power regarding the development of the Hells Canyon stretch of the Snake River (lying northerly along a portion of the western boundary of Idaho). Jordan sought to apply pressure to Idaho Power by insisting upon subordination clauses being inserted in the licenses for the proposed Hells Canyon project.

Faced with Jordan's attitude, which was reflected by his administrative department charged with issuing state water right licenses, Idaho Power agreed to subordinate their state water right license at C.J. Strike to future upstream depletion. That water license was issued in 1953 and contained the first unrestricted subordination language on record.

As to the Hells Canyon stretch of the Snake River, two competing proposals had been put forward. One, a single massive structure to be known as High Hells Canyon project, was to be constructed and operated by the federal government. The second was the proposal of Idaho Power to build three smaller dams on the same por-

tion of the river. Legislation authorizing the federal project was introduced in Congress and contained a subordination clause, but attached certain conditions giving the federal government limited control over the reasonableness of future upstream depletions. *Hells Canyon Dam: Hearings on H.R. 5743, Before the Subcomm. on Irrigation and Reclamation of the House Comm. on Interior and Insular Affairs,* 82d Cong., 2d Sess. 510 (1952) (statement of Rep. Engle).

To obtain the influence of Jordan and the irrigators, then as now a powerful political force in the state, for its Hells Canyon three-dam project, Idaho Power proposed that the FPC license for the Hells Canyon project contain a clause subordinating its rights to future upstream depletion without condition. That distinction between the two projects appears to be one of the major factors in gaining Jordan's support for Idaho Power's proposal. *Id.* at 501 (statement of Gov. Jordan). By the time of the senate hearings on the Hells Canyon project in 1955, Robert E. Smylie was governor of Idaho. Smylie also reiterated the state's interest in full unconditional subordination of Idaho Power's water rights in Hells Canyon project to future upstream diversion. *Hells Canyon Project: Hearings on S. 1333 Before the Subcomm. on Irrigation and Reclamation of the Senate Comm. on Interior and Insular Affairs,* 84th Cong. 1st Sess., 6 (1955) (statement of Gov. Smylie).

Idaho Power asserts that its economic survival was dependent upon the Hells Canyon project and that it thus agreed to subordinate its water rights at Hells Canyon in return for the support of state government and the agricultural irrigators. While such might be regarded as an overstatement, nevertheless, the Hells Canyon dams remain today one of the more important parts of Idaho Power's rate base. Another factor, although unarticulated, may well be that a single high federal dam would have been administered by the Bonneville Power Administration, and historically, Idaho Power has actively opposed efforts to extend Bonneville Power's authority into this por-

tion of the Northwest. *See* G. Young & F. Cochrane, *Hydro Era: The History of Idaho Power Co.,* 64 (1978); Idaho Evening Statesman, May 30, 1963, p. 8 (full page advertisement by Idaho Power).

At the time of the pendency of congressional action authorizing the federal High Hells Canyon project, Idaho Power had initiated and was engaged in proceedings before the FPC to obtain a license for its three-dam project. In 1955 the FPC issued a single license to Idaho Power for the construction of three dams (Low Hells Canyon, Oxbow and Brownlee), stating that the dams should be treated for the purposes of that license as "one complete project." Consistent with the request of Idaho Power, that license contained a subordination provision with no conditions attached. In another portion of the Hells Canyon license, minimum flows were required at specified points on that reach of the river in accordance with the federal governments' navigational servitude. (Hells Canyon Project FPC license, Article 43). The FPC order granting the license to Idaho Power was appealed by proponents of the federal High Hells Canyon dam to the D.C. Circuit of the United States Court of Appeals. That Court held that the FPC was not required to approve a potential federal project over an available private project and that the FPC was not required to measure a federal project it had just rejected against the remaining private project to determine which of the two was the "best adapted" plan for developing the waterway. *National Hells Canyon Ass'n v. Federal Power Comm'n,* 237 F.2d 777 (D.C.Cir.1956), *cert. denied,* 353 U.S. 924, 77 S.Ct. 681, 1 L.Ed.2d 720 (1957). The subordination clause, its validity or scope, was neither challenged nor considered on that appeal.

Following construction of Idaho Power's three Hells Canyon dams, state water licenses were issued. Seven of those licenses appear in the record here. One is a storage right measured in acre-feet, and the six others are flow rights measured in cubic feet per second (cfs). Two of those licenses contain subordination clauses identical to that in the FPC license, *i.e.* one granted for Brownlee in 1964 for a flow of 10,000 cfs with a priority date of 1965, and the second granted at the same time for Oxbow for a flow of 14,000 cfs with a priority date of 1964. The other four licenses for water flow rights, one each for Oxbow and Brownlee and two for Low Hells Canyon, are silent upon the subject of subordination.

Thereafter in the 1960s other projects continued to be proposed for the Snake River in the area of Hells Canyon. A utility consortium obtained an FPC license for a proposed High Mountain Sheep dam one mile below the confluence of the Salmon and Snake Rivers. That license was overturned by the U.S. Supreme Court on the grounds that the FPC had failed to consider a proposed federal project for the site and failed to fully consider the "recreational purposes" served by the river, including the conservation of anadromous fish. *Udall v. Federal Power Comm'n,* 387 U.S. 428, 87 S.Ct. 1712, 18 L.Ed.2d 869 (1967). That dam was not and has not been built. During the late 1960s, a congressional moratorium was placed on dam building in Hells Canyon. Subsequently Congress placed Hells Canyon downstream from Low Hells Canyon dam within the Wild and Scenic Rivers system, thereby effectively foreclosing any further hydroelectric development on that stretch of the Snake River. 16 U.S.C. §§ 1274(12), 1273(b)(1), 1273(b)(2).

During the same period of time in the 1960s, the state of Idaho negotiated with Idaho Power over a proposed dam known as the Guffey project. It was to be built downstream from Swan Falls and would be substantially higher than the Swan Falls dam. Such a joint venture was authorized by the legislature, 1971 Idaho Sess.Laws, Ch. 265, p. 1064. *See generally Idaho Water Resource Board v. Kramer,* 97 Idaho 535, 548 P.2d 35 (1976). Such a joint venture contract was entered into in 1972, amended in 1974 and again in 1976. That project was abandoned in 1979 following the withdrawal of the Snake River Birds of Prey area in 1971, its expansion in 1975, and an environmental impact statement released in 1978, indicating major environ-

mental difficulties with the proposed project.

The legislature enacted a comprehensive water resource policy in 1978 establishing minimum stream flows on the Snake River. I.C. § 42–1736A. That statute established minimum flows of 5000 cfs at Johnson's Bar, 4750 cfs at Weiser, and 3300 cfs at Murphy (just downstream from the Swan Falls dam). Those minimum flows were set aside as beneficial uses.

The cessation of construction of hydroelectric facilities on the Snake River, the scrapping of plans for coal-fired power plants, oil embargoes and escalating costs and opposition to nuclear generation plants, all coupled with a continuing demand for energy, have been the cause of large concern and have inevitably focused attention on the existing hydroelectric plants.

The genesis of the instant litigation was a complaint filed with the Idaho Public Utilities Commission by one Matthew Mullaney on behalf of himself and other ratepayers alleging that Idaho Power had failed to protect and preserve its Swan Falls water rights and that, by so doing, Idaho Power had wasted its assets and overstated its capital investment, thus resulting in overcharges to its ratepayers. Idaho Power sought to have that complaint dismissed for lack of jurisdiction. Idaho Power's motion to dismiss was denied, and Idaho Power answered the complaint indicating it would file an action in district court to protect those Swan Falls water rights. A large number of applications for water permits were then pending before the Idaho Department of Water Resources and Idaho Power filed protests against a large number of those applications. In the interim, and pending the outcome of this case, the Public Utilities Commission has retained jurisdiction over the Matthew Mullaney complaint.

Idaho Power's action in the district court named as defendants the Public Utilities Commission, the Department of Water Resources, numerous canal and irrigation companies, and individuals involved with irrigation, together with the ratepayers who brought the complaint before the Public Utilities Commission. Therein Idaho Power sought a decree that its Swan Falls rights were not subject to upstream depletion and that the state water plan was a taking of those rights. Idaho Power also sought to have the court identify those areas where its water rights were protected. The Department of Water Resources answered Idaho Power's complaint, claiming that the State Constitution allows the state to limit hydropower rights and that Idaho Power had lost those rights by adverse possession, forfeiture, and abandonment. Grandview Canal Co. in its answer added laches and subordination in the Hells Canyon and Strike licenses as affirmative defenses, and Nelda McAndrew added waiver and quasi-estoppel to the list of affirmative defenses. The Public Utilities Commission in its answer claimed primary jurisdiction and raised the questions of applicability of I.C. Title 61. The Public Utilities Commission also sought to obtain declaratory relief. All parties then filed motions and cross motions for summary judgment based in part or in whole upon their respective theories of the case.

As a preliminary matter, the district court assumed that Idaho Power's Swan Falls water rights held priority dates from 1907 to 1930 rather than 1900 to 1919. That portion of the order is not an issue of this appeal, and we express no view as to whether those priority dates were correctly assumed by the district court.

The district court next held that Article 41 of the Hells Canyon Project's FPC license, subordinating Idaho Power's water rights, was a lawful exercise of power by the FPC. In that part of the decision the district court relied upon the FPC's power to implement a comprehensive development of navigable waters, its authority to impose conditions on licensees, the state legislature's recognition of desirability of subordination clauses in the enabling legislation for the now defunct Guffey joint project, and a U.S. Supreme Court case recognizing use of water for irrigation as being a public use. In so upholding the validity of Article 41, the district court held it was not necessary

to reach a number of related issues: (1) Whether the licenses can be collaterally attacked; (2) whether the Public Utility Commission and the ratepayers are real parties in interest; (3) whether the Public Utility Commission and the ratepayers have standing to attack the validity of Article 41; and (4) whether the subordination was a transfer in violation of I.C. § 61–327 et seq.

The district court next held that the effect of the subordination language in Article 41 of the Hells Canyon license had subordinated all of Idaho Power's water rights used in hydropower production at all of its facilities on the entire Snake River watershed. In reaching that result the district court relied on federal preemption under the Federal Power Act. The court focused on language in Article 41 subordinating water rights at the Hells Canyon project to future upstream depletion "on the Snake River and its tributaries," from which the court reasoned that this meant the entire river upstream could be depleted, including any water rights at any other dam upstream from Hells Canyon. The court reasoned that since the entire river is one hydropower system, with Idaho Power operating its dams in a coordinated manner, such system could not be subordinated in bits and pieces.

As to the Public Utilities Commission's contention that Idaho Power had violated I.C. § 61–327 et seq., by the acceptance of the subordination language of Article 41 in its licenses, the court held that the Commission had no standing, or in the alternative was barred by estoppel, res judicata and laches. The court also held that Idaho Power's upstream rights were not "interests in property" and that the subordination language of Article 41 was not a transfer of property under I.C. § 61–327 et seq. It further held that if any such transfer did occur, it was forced upon Idaho Power by the federal government, and the power increase obtained by the acceptance of that subordination clause was so much in the public interest, it outweighed any violation of those sections.

As to Idaho Power's demand for compensation for loss of its Swan Falls water rights, the district court held that Idaho Power had waived whatever right it had to demand such compensation in accepting the licenses with the subordination provisions. The court reasoned that Idaho Power was barred from seeking damages since, although it had the right to compensation for its Swan Falls water rights, they had been bargained away in exchange for the FPC license.

The court held that the minimum flow requirement in the state water plan, I.C. § 42–1736A, was the exercise of a valid police power of the state to protect the public welfare.

Finally, the district court held that its decision subordinating the water rights of the entire system to all future upstream depletion had mooted the contention that Idaho Power had lost its water rights at Swan Falls by forfeiture, abandonment, adverse possession, equitable estoppel and customary preference.

This appeal and these cross-appeals were filed from the decision of the district court and the parties have stipulated to the existence of five broad issues as constituting the assignments of error:

## I. THE SUBORDINATION CLAUSE

On appeal the first issue presented is the authority of the FPC to insert a subordination clause into the Hells Canyon project license. We affirm the district court and hold that the subordination clause is a valid condition which, within the circumstances of this case, fell within the power and authority of the FPC.

Section 10 of the Federal Power Act provides that FPC licenses "shall be" issued on the following pertinent conditions:

"(a) That the project adopted, including the maps, plans, and specifications, shall be such as in the judgment of the Commission will be best adapted to a comprehensive plan for improving or developing a waterway or waterways for the use or benefit of interstate or foreign commerce, for the improvement and utiliza-

tion of water-power development, and for other beneficial public uses, including recreational purposes." 16 U.S.C. § 803(a).

The ratepayers and the PUC argue that such statutory language confers on the FPC the power to approve only conditions involving non-consumptive use to the end that water be retained in the river for commerce and hydropower. We disagree.

▪ The Federal Power Act was passed by Congress in 1920, but it had its roots in the philosophies of Theodore Roosevelt's administration that the country's natural resources should be developed in an orderly manner and water resources should be developed by a single governmental agency responsible for coordinated planning of flood control, navigation, hydropower, irrigation, and waterway improvements. That philosophy was opposed by various forces including the Corps of Army Engineers, which then had existing jurisdiction over flood control and navigation, as well as those interests who wanted free use of the nation's waterways and resources. *See* S. Hays, *Conservation and the Gospel of Efficiency* (1959); G. Pinchot, *Breaking New Ground* (1947). The struggle between those opposing forces resulted in the passage of a compromise Federal Power Act, which did not provide for the single agency concept. Hays, *supra*. We deem it clear, however, that the Act delegated to the FPC the authority, in Section 10 thereof, to consider uses other than mere hydropower production. G. Pinchot, *The Long Struggle for Effective Federal Water Power Legislation,* 14 Geo.Wash.L.Rev. 9 (1945).

▪ It also appears clear from the legislative history of the Act, that the FPC was required to consider irrigation as one of the other uses in its determination of whether a project is "best adapted for a comprehensive plan" for the waterway. In the committee hearings, each appearing witness was questioned by Rep. Raker of California as to his belief on the question of whether the bill encompassed irrigation. Therein the Forest Service and administration spokesman, O.C. Merrill, indicated that the Administration intended that the Commis-

sion consider irrigation as part of the comprehensive plan.

"Mr. MERRILL. [T]he commission . . . should make a thorough examination of the stream and prepare, as the bill provides, for a scheme of development that will utilize to the full the resources of that stream for every purpose.

Mr. RAKER. That is just what I am asking about.

Mr. MERRILL. Irrigation, water power, water supply, navigation, and whatever there may be; and it should have a plan drafted which would comprehend that, and then it should, in considering applications for license, approve the application of that applicant who will carry out to the best degree the plans prepared.

\* \* \* \* \* \*

Mr. ESCH. So you get the utmost use, whether for irrigation or for power?

Mr. MERRILL. And that is the intention, judge, that the plan for development that should be approved should take into consideration all uses that can be made of the water and of the site in that particular locality, as a unit.

\* \* \* \* \* \*

Mr. MERRILL. In my judgment it is covered by the provisions of subparagraph (a) of section 10, as well as by the last part of section 7 in the preferences. Not only should the scheme of development be considered in relation to irrigation and to navigation and to water power, but also to flood control."

*Hearings on Water Power Before the House Comm. on Water Power,* 65th Cong.2d Sess. 90–94 (1918).

*See also* the colloquy between the Secretary of the Interior and Rep. Raker and Rep. Hamilton.

"[Mr. RAKER.] Now I wanted to suggest and to ask you if you do not believe it would be a wise thing in this bill, and in this connection, after having designated navigation and water-power development, that we should make irrigation as important as we do those two and should

include the word "irrigation" in that connection, so there would be no possible doubt as to what the intention of Congress was in such legislation; and in order that we may get two developments, water power and irrigation, to their utmost. I would like to ask if you do not think it would be a good thing to so draft the bill that we would be sure to get all those uses?

Secretary LANE. I can not see now any objection to it, Judge. It seems to me in the granting of a power proposition you have got to take into consideration what is the best use to make of that water, and there should not be a development simply of power to the exclusion of irrigation.

\*    \*    \*    \*    \*    \*

Mr. HAMILTON. Is there any danger of irrigation being overlooked in that connection?

Mr. RAKER. It is my purpose and I believe it is the duty of the committee to so get it before the committee that it could not be overlooked.

Mr. HAMILTON. It can not be."

*Id.* at 455–56.

*See also* Congressman Raker's summation of the testimony before the committee: "I have suggested to add in there [Section 10] 'and irrigation, and of other beneficial public uses.' Now, I asked particularly Mr. Merrill and every man that had been on the stand in regard to this provision, and they all say unanimously that those words are intended to cover irrigation and all other matters that may be used in connection with the project. So therefore, if there is water-power development connected with it, navigation or irrigation, it applies."

*Id.* at 615–16. *See* W. Walker & W. Cox, *Jurisdiction of the Federal Power Commission over Non-Power Water Uses,* 5 Land & Water L.Rev. 65, 70–75 (1970).

The Public Utilities Commission and the ratepayers argue that the case law to this date has established that the FPC's authority to consider various factors has not in-cluded non-consumptive uses. While many of the cases cited do direct the FPC to consider nonconsumptive uses such as recreation and fish conservation, *e.g. Udall v. Federal Power Comm'n,* 387 U.S. 428, 87 S.Ct. 1712, 18 L.Ed.2d 869 (1967), we find that none of those cases state that such nonconsumptive uses are the only ones that may be considered by the FPC. We cannot conceive that with agricultural irrigation being such a large factor in both federal and private development of the arid lands of the West, a federal agency developing a "comprehensive" plan would be precluded from considering the effect of irrigation. Indeed the United States Supreme Court, while recognizing that hydroelectric power was the principal use to be regulated by the Federal Power Act stated:

"The central purpose of the Federal Water Power Act was to provide for the comprehensive control over those uses of the Nation's water resources in which the Federal Government had a legitimate interest; these uses included navigation, *irrigation,* flood control, and, very prominently, hydroelectric power—uses which, while unregulated, might well be contradictory rather than harmonious." (emphasis added)

*Federal Power Comm'n v. Union Electric Co.,* 381 U.S. 90, 98, 85 S.Ct. 1253, 1257, 14 L.Ed.2d 239 (1965). While that language might arguably be dicta, it supports the interpretation we have made of the legislative history and intent behind the Act. *See also Chemehuevi Tribe of Indians v. Federal Power Comm'n,* 420 U.S. 395, 408, 95 S.Ct. 1066, 1074, 43 L.Ed.2d 279 (1975); *Harris v. Central Nebraska Public Power & Irrigation Dist.,* 29 F.Supp. 425 (D.Neb.1938).

Finally, we note that Section 10 of the Act specifically requires that "other beneficial public uses" be considered in the comprehensive plan. 16 U.S.C. § 803(a). At the time of the passage of the Act, the United States Supreme Court had long recognized that irrigation was a "public use", *Clark v. Nash,* 198 U.S. 361, 369–70, 25 S.Ct. 676, 678–79, 49 L.Ed. 1085 (1905); *Fallbrook Irrigation Dist. v. Bradley,* 164 U.S. 112, 160–61, 17 S.Ct. 56, 63–64, 41 L.Ed. 369

(1896). *See also,* Id. Const. Art. 15, § 1 (providing in the original constitution, adopted in 1889, and continuing to the present, that irrigation is a public use). Hence we hold that the condition in the Hells Canyon license subordinating Idaho Power's water rights to future upstream depletion was within the authority of the FPC.

As indicated above, the trial court viewed the subordination language in Article 41 of the Hells Canyon licenses as subordinating all of Idaho Power's water rights on the entire Snake River watershed. We disagree and hold that the language of the subordination clause affects the operation of the three dams in the Hells Canyon project only and does not extend to the other dams on the river, and specifically does not subordinate the water rights of Idaho Power at Swan Falls.

The language of Article 41 provides:

"The project shall be operated in such manner as will not conflict with the future depletion in flow of the waters of Snake River and its tributaries, or prevent or interfere with the future upstream diversion and use of such water above the backwater created by the project, for the irrigation of lands and other beneficial consumptive uses in the Snake River waterhead. (sic)." (emphasis added).

The license states that the proposed Brownlee, Oxbow, and Low Hells Canyon dams "for the purposes of this license shall be considered as units of one complete project." FPC Order issuing license, August 9, 1955, at 10. We deem therefore that when Article 41 requires "the project" to be operated in such a manner that it will not interfere with future upstream depletion, it refers to Brownlee, Oxbow and Low Hells Canyon dams and demonstrates no intent that all of Idaho Power's dams on the river be considered as "the project" subject to subordination. Further, the opinion and order of the FPC issuing the Hells Canyon dams licenses contain no mention of the Swan Falls dam or the subordination of Idaho Power's water rights in

that dam, and we find therefore no intent to subordinate water rights at other projects.

We have considered and reject the argument of the Department of Water Resources and canal companies that permitting Swan Falls to receive its full water right allocation somehow allows Idaho Power to utilize those rights at Hells Canyon in violation of Article 41 of the Hells Canyon FPC license.

Finally on this issue, we deem it questionable whether the FPC would have the authority to subordinate then-existing water rights, even assuming such had been the intent in the Hells Canyon licenses. Section 27 of the Federal Power Act, known as the "Savings Clause" provides that the Act does not intend to interfere with any vested right acquired under state water law. 16 U.S.C. § 821. *See Federal Power Comm'n v. Niagara Mohawk Power Corp.,* 347 U.S. 239, 74 S.Ct. 487, 98 L.Ed. 686 (1954); *Henry Ford & Son, Inc. v. Little Falls Fibre Co.,* 280 U.S. 369, 50 S.Ct. 140, 74 L.Ed. 483 (1930). Here Swan Falls water rights were vested, having been acquired in the early part of this century. *Cf. Hidden Springs Trout Ranch v. Allred,* 102 Idaho 623, 636 P.2d 745 (1981); *Big Wood Canal Co. v. Chapman,* 45 Idaho 380, 263 P. 45 (1927). We further note in this regard that Section 6 of the Federal Power Act states that licenses can be altered only after thirty days public notice. 16 U.S.C. § 799. Clearly Idaho Power possessed a valid license for the operation of Swan Falls. Nowhere in the record before us is there any indication that the public notices of the Federal Power Commission proclaim any intent to amend Idaho Power's Swan Falls license.

The district court, as noted above, held that Idaho Power had waived its right to compensation for its water rights at Swan Falls by accepting the subordination clause in the Hells Canyon license. Since we have concluded that Hells Canyon license subordination clause does not affect Swan Falls water rights, that portion of the district court decision is reversed.

## II. THE SAVINGS CLAUSE

A number of subsidiary yet important issues have been raised which flow from the FPC licenses and in particular, the subordination clauses thereof. Those issues involve the interplay between state water law, the Federal Power Act, and the provisions of the FPC licenses. The resolution of those issues focuses upon the "Savings Clause" of Section 27 of the Federal Power Act. Therein it is provided:

"Nothing contained in this chapter shall be construed as affecting or intending to affect or in any way to interfere with the laws of the respective States relating to the control, appropriation, use, or distribution of water used in irrigation or for municipal or other uses, or any vested right acquired therein."

16 U.S.C. § 821.

■ The ratepayers and the Public Utilities Commission assert that Section 27 "saves" all Idaho water law; that Idaho water law forbids subordination; and that therefore the subordination clause in the Hells Canyon license is in conflict with Idaho water law and ineffective. We disagree. No case holding that subordination is prohibited by Idaho water law or the law of any state has been cited to us. Rather, the ratepayers and the Public Utilities Commission rely on Idaho's constitutional provision of priority in time being priority in right. Id. Const. Art. 15, § 3.

The record here makes it clear that Idaho Power voluntarily agreed to have the subordination clause inserted in the Hells Canyon licenses. We find nothing in the law of this state which precludes a person from voluntarily obtaining less than the full panoply of rights associated with the ownership of real property. Agreements not to assert ownership rights to their fullest are common in today's society, *e.g.* restrictive covenants and equitable servitudes. Whatever merits such an argument may have with regard to subordination clauses forced upon an unwilling appropriator by the FPC or the state, we need not decide. We hold only that a voluntary subordination agreement is not in violation of Idaho's water

law, and therefore we find no conflict between our state water law and the language of the subordination clause inserted in the Hells Canyon licenses.

■ The record indicates that of the six state water licenses for flow rights at the Hells Canyon project, only two of those licenses contain a subordination clause. Ratepayers and the Public Utilities Commission assert therefore that the four state water licenses not containing such clauses somehow control and override the federal subordination clause contained in the FPC licenses. Again we disagree. However, neither do we agree with the assertion of the canal companies that the state water licenses are preempted by the federal license.

■ Authorization from the FPC is a threshold step for constructing a dam on navigable waters. *United States v. Appalachian Electric Power Co.,* 311 U.S. 377, 6 S.Ct. 291, 85 L.Ed. 243 (1940); *Citizens Utilities Co. v. Prouty,* 122 Vt. 443, 176 A.2d 751 (1961), *cert. denied,* 369 U.S. 838, 82 S.Ct. 867, 7 L.Ed.2d 842 (1962). The Federal Power Act does preempt *some* state laws relating to the building of dams on navigable streams and particularly does it preempt those state laws which require a state license as a predicate for building a dam. *First Iowa Hydro-Electric Coop. v. Federal Power Comm'n,* 328 U.S. 152, 66 S.Ct. 906, 90 L.Ed. 1143 (1946); *State v. Idaho Power Co.,* 211 Or. 284, 312 P.2d 583 (1957); *City of Tacoma v. Taxpayers of Tacoma,* 43 Wash.2d 468, 262 P.2d 214 (1953). However, state law regarding proprietary rights in water is expressly saved. *Federal Power Comm'n v. Niagara Mohawk Power Corp.,* 347 U.S. 239, 74 S.Ct. 487, 98 L.Ed. 686 (1954); *Henry Ford & Son, Inc. v. Little Falls Fibre Co.,* 280 U.S. 369, 50 S.Ct. 140, 74 L.Ed. 483 (1930); *cf. California v. United States,* 438 U.S. 645, 98 S.Ct. 2985, 57 L.Ed.2d 1018 (1978) (savings clause of Reclamation Act). Under Idaho law, a water license does not issue until after the diversion works are completed and the water is applied to a beneficial use, albeit an application for licensure can be made prior to

actual construction. I.C. §§ 42–202 to 42–219; *Big Wood Canal Co. v. Chapman,* 45 Idaho 380, 405–06, 263 P. 45, 53–54 (1927). When the FPC licensed Idaho Power's Hells Canyon project, it was conditioned upon Idaho Power obtaining only such water rights as would not interfere with future upstream depletion. This insertion of that subordination clause in the FPC licenses had the consent, knowledge and support of Idaho's state officials. *Hells Canyon Dam: Hearings On H.R. 5743 Before The Subcomm. on Irrigation and Reclamation of the House Comm. on Interior and Insular Affairs,* 82d Cong., 2d Sess. 501 (1952) (statement of Gov. Jordan); *Hells Canyon Project: Hearings on S. 1333 Before the Subcomm. on Irrigation and Reclamation of the Senate Comm. on Interior and Insular Affairs,* 84th Cong., 1st Sess. 6 (1955) (statement of Gov. Smylie). There can be no doubt from this history that the officials of the State of Idaho intended and believed that Idaho Power's water rights at Hells Canyon were subordinated. No party asserts that the subordination language was omitted from some of the state water licenses because the state officials intended to override the federal subordination clause. Whether the subordination language was omitted from the state water licenses through administrative oversight or because the appropriate state officials felt its insertion unnecessary in light of the federal license language, we need not speculate. We hold only that when the FPC has authorized the obtention of only subordinated state water rights, and where, as here, the state and the licensee power company both intended the subordination of those water rights, failure to include a subordination clause in the state water licenses does not render those rights unsubordinated. Since we so hold, we need not reach the more delicate issues of federalism that might arise from an FPC authorization for one form of water rights at a licensed project, and the state, in the exercise of its authority, expressly authorizing a greater or lesser form of water right.

■ During proceedings below parties advanced various affirmative defenses wherein it was asserted that Idaho Power had lost all or part of its water rights at Swan Falls or was barred from asserting those rights. The district court held that those issues were rendered moot by its ruling that the subordination included the Swan Falls water rights. Since we have reversed that ruling of the district court, the cause must be remanded for consideration of, and findings of fact and conclusions of law on the issues raised by those affirmative defenses alleging the loss of Idaho Power's water rights at Swan Falls. Although we are urged to make such a determination here, we deem those issues to involve factual determinations inappropriate to this Court.

The elements of abandonment and forfeiture are set out in several recent decisions of this Court and need not be reiterated here. *Jenkins v. State Department of Water Resources,* 103 Idaho 384, 647 P.2d 1256 (1982); *Sears v. Berryman,* 101 Idaho 843, 623 P.2d 455 (1981); *Gilbert v. Smith,* 97 Idaho 735, 552 P.2d 1220 (1976).

It is also argued that the issues of abandonment and forfeiture are preempted by Article 21 of the FPC license issued for the operation of Swan Falls. That provision states:

"Article 21. It is hereby understood and agreed that the Licensee, its (his) successors and assigns will, during the period of this license, retain the possession of all project property covered by this license as issued or as hereafter amended, including the project area, the project works, and all franchises, easements, *water rights,* and rights of occupancy and use; and that none of such properties valuable and serviceable to the project and to the development, transmission, and distribution of power therefrom will be voluntarily sold, transferred, *abandoned,* or otherwise disposed of without the approval of the Commission." (emphasis added)

■ In Idaho, "[i]f a water right has indeed been lost through abandonment or forfeiture, the right to use that water reverts to the state and is subject to further

appropriation. [citations omitted]... Other parties may then perfect a water right in those waters." *Jenkins v. State Department of Water Resources, supra* (slip. op. at 6) (1982). Under Section 27 of the Federal Power Act, 16 U.S.C. § 821, all state water law is preserved "relating to the control appropriation, use, or distribution of water." Idaho's state water law, allowing subsequent appropriators to perfect a water right in water that has been abandoned or forfeited clearly relates to the control, appropriation, use or distribution of water. Hence, we deem it follows that neither the Federal Power Act nor a license issued pursuant to that authority has overridden Idaho's law of abandonment or forfeiture of water rights. *Cf. California v. United States,* 438 U.S. 645, 98 S.Ct. 2985, 57 L.Ed.2d 1018 (1978). To what extent, if any, the Article 21 "retain possession" language may create a cause of action against the licensee or others, the complex questions of plaintiff's standing and other questions are not substantially presented here, and we doubt the authority of any state forum to adjudicate such an action.

### III.  EFFECT OF I.C. §§ 61–327 to 61–331

The PUC asserts that if Idaho Power has subordinated water rights used in the generation of electricity, it has violated I.C. §§ 61–327 and 61–328. I.C. § 61–327 provides generally that property in this state used in the generation or transmission of electricity shall not be transferred in any manner to out-of-state organizations, governmental entities, or any entity not subject to regulation by the PUC. I.C. § 61–328 provides that any transfer of such property must be approved by the PUC after public hearings. I.C. § 61–329 states that property transferred in violation of those sections shall escheat to the state and the attorney general must institute court proceedings to adjudicate such an escheat, and I.C. § 61–331 sets forth criminal penalties for violation of the preceding sections. The Public Utilities Commission concedes that if the Hells Canyon water rights were subordinated at the time of acquisition, the above

statutes would not apply. Here we have held that Idaho Power acquired only subordinated water rights at the Hells Canyon complex, therefore, there has been no transfer, and those statutes do not apply. We have held that the Swan Falls water rights were not subordinated, but we have also held that the cause must be remanded for consideration of whether Idaho Power has abandoned or forfeited any of its water rights at Swan Falls. Since the argument of the Public Utilities Commission can be applied to the question of abandonment and forfeiture, we turn to the consideration of the applicability of those statutes to abandonment or forfeiture of a water right. *See* I.C. § 1–205; *Tibbs v. City of Sandpoint,* 100 Idaho 667, 670, 603 P.2d 1001 (1979); *County of Bingham v. Woodin,* 6 Idaho 284, 289, 55 P. 662 (1898).

While we agree that the language of the statute I.C. §§ 61–327 to 61–331 is very broad in forbidding any transfer "directly or indirectly, in any manner whatsoever" (I.C. § 61–328), nevertheless, we hold they are inapplicable to abandonment or forfeiture of a water right. If those sections were applied to abandonment or forfeiture of a water right used to generate electricity, the attorney general would be required to file an action to have such an escheat decreed, and thereafter there would be a court ordered sale of the property. Such a scheme is totally inconsistent with Idaho water law, which provides that if a water right is abandoned or forfeited it reverts to the state, following which third parties may perfect an interest therein. I.C. § 42–222(2); *Jenkins v. State Department of Water Resources,* 103 Idaho 384, 647 P.2d 1256 (1982); *Sears v. Berryman,* 101 Idaho 843, 623 P.2d 455 (1981); *Gilbert v. Smith,* 97 Idaho 735, 552 P.2d 1220 (1976). Absent a clear legislative mandate, we will not infer such an intent from a provision of a statute relating to Public Utility Regulation.

### IV.  THE STATE WATER PLAN

It is next argued by Idaho Power that the State Water Plan effectuates a taking of its

Swan Falls water rights without payment of just compensation. That assertion was rejected by the trial court, and we agree with that court's conclusion. The State Water Plan was enacted by the legislature in 1978 and codified at I.C. § 42–1736A (1981 Supp.). That plan established as a beneficial use minimum stream flows at various points along the Snake River. A flow of 3300 cfs on the Snake River at the Murphy gaging station was established. I.C. § 42–1736A(2). The Murphy gage is just downstream from the Swan Falls dam and power plant. Idaho Power argues that the river may thereby be depleted to 3300 cfs at the Murphy gage in derogation of its water rights of 8400 cfs at Swan Falls.

We hold that the State Water Plan does not mandate a taking of Swan Falls water rights. There is no requirement contained therein that the Snake River be depleted to 3300 cfs at Swan Falls, but rather the plan only prohibits a reduction below 3300 cfs. To that extent, if anything, it protects the Swan Falls rights to the extent of 3300 cfs. I.C. § 42–1736A recognizes House Concurrent Resolution No. 48 (44th Leg., 2d Sess.1978) as the guide for the interpretation for the state water plan. Policy No. 1 of that Resolution requires the protection of all existing water rights vested under state law. Since we have held that Idaho Power's water rights at Swan Falls are vested, the State Water Plan is not to be construed as affecting those water rights.

## V. CONCLUSION

In summary, we hold that the Federal Power Commission lawfully acted within its authority in issuing the license for Hells Canyon project by the insertion of the subordination clause therein and such subordination clause is a valid condition of the license. However, we hold that that subordination clause applies only to the Hells Canyon project water rights, and not to those at Swan Falls or any other dams upriver. We hold that by accepting the subordination clause for the Hells Canyon project, Idaho Power has not waived its compensation for any taking of its Swan Falls water rights. Having differed in the latter two conclusions from the decision of the district court, we must remand this cause for further proceedings on the affirmative defense issues raised below and not there decided. With respect to the statutes requiring Public Utilities Commission approval of transfers of utility property, we hold that the statutes do not apply to water rights subordinated when acquired, nor do they apply to water rights which have been abandoned or forfeited. Finally, we hold that the State Water Plan does not take Idaho Power's water rights at Swan Falls without payment of compensation. We have not specifically dealt with a number of arguments raised by the parties which we deem to have been subsumed by our discussion of the issues, and therefore, we intimate no views on the validity of those arguments.

The judgment of the district court is affirmed in part, reversed in part, and remanded. Each party to bear its own costs.

DONALDSON, C.J., BAKES and BISTLINE, JJ., and McFADDEN, J. (Ret.), concur.