36 F.3d 893
 39 ERC 1726, 63 USLW 2227, 24 Envtl.
L. Rep. 21,530
 UNITED STATES DEPARTMENT OF COMMERCE, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent.
The NEZ PERCE TRIBE, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent.
NATIONAL WILDLIFE FEDERATION; Idaho Wildlife Federation, Petitioners,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent.
 Nos. 93-70282, 93-70284 and 93-70287.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Aug. 9, 1994.
Decided Oct. 5, 1994.
 
 John T. Stahr, U.S. Dept. of Justice, Environment and Natural Resources Div., Washington, DC, for petitioner U.S. Dept. of Commerce.
 Douglas Nash, The Nez Perce Tribal Executive Committee Office of Legal Counsel, Lapwai, Idaho, for petitioner Nez Perce Tribe.
 Peter M.K. Frost, National Wildlife Federation, Portland, OR, for petitioners National Wildlife Federation and Idaho Wildlife Federation.
 Samuel Soopper, Federal Energy Regulatory Com'n, Washington, DC, for respondent F.E.R.C.
 Petitions for Review of a Decision of the Federal Energy Regulatory Commission.
 Before: NORRIS, THOMPSON and TROTT, Circuit Judges.
 Opinion by Judge THOMPSON; Dissent by Judge TROTT.
 DAVID R. THOMPSON, Circuit Judge:
 
 
 1
 Chinook salmon and steelhead trout are anadromous fish.[1] They are an important natural resource, exploited by commercial, sport and Indian tribal fishermen fishing in the Columbia and Salmon River Basins and in the Pacific Ocean from Oregon, California, Washington, Alaska and British Columbia.
 
 
 2
 Anadromous fish spawn, among other places, in tributaries of the Salmon River. One such tributary is Allison Creek, a non-navigable body of water. In 1955, Guy M. Carlson built a small hydroelectric project on Allison Creek next to his property. The project generates a modest amount of electricity which is wholly consumed on Carlson's property and used for his ranch house and outbuildings. The project's dam, a 3-foot-high structure, blocks the migration of anadromous fish, preventing them from spawning in the portion of Allison Creek above the dam.
 
 
 3
 In 1985, Carlson filed with the Federal Energy Regulatory Commission (FERC) a declaration of intention to continue operating his hydroelectric project. FERC requires such a declaration in connection with its investigation and determination whether a project requires a license under Sec. 23(b)(1) of the Federal Power Act (the Act), 16 U.S.C. Sec. 817(1). Section 23(b)(1) directs the Commission to
 
 
 4
 cause immediate investigation of such proposed construction to be made, and if upon investigation it shall find that the interests of interstate or foreign commerce would be affected by such proposed construction, such person ... shall not construct, maintain, or operate such dam or other project works until it shall have applied for and shall have received a license under the provisions of this chapter.
 
 
 5
 If FERC concludes a license is required under Sec. 23(b), a necessary condition of the license is that the project "be best adapted to a comprehensive plan ... for the adequate protection, mitigation, and enhancement of fish and wildlife (including related spawning grounds and habitat)...." 16 U.S.C. Sec. 803.
 
 
 6
 After conducting an investigation, the Director of FERC's Office of Hydropower Licensing issued an order that the project did not require a license because it did not occupy public lands, did not use surplus water or water power from a federal dam, and no power generated by the project was transported across state lines or fed into an interstate power system.
 
 
 7
 The Department of Commerce, the Nez Perce Tribe, the National Wildlife Federation and the Idaho Wildlife Federation ("Petitioners") appealed the order to FERC. They argued that Carlson's project required a license because of its impact on the spawning of anadromous fish, an impact that affected "the interests of interstate or foreign commerce" within the meaning of Sec. 23(b)(1) of the Act. FERC rejected this argument by a 3-to-2 vote, holding that a project's effect on anadromous fish, even though it may affect interstate or foreign commerce, can never provide the basis for FERC's licensing jurisdiction. Guy M. Carlson, 62 FERC p 61,009 (1993). FERC also held, "Even assuming, arguendo, that FERC could assert mandatory jurisdiction based on a project's effect on anadromous fisheries, the effect of the Carlson project on the anadromous fishery is too insubstantial to constitute such an effect." Id. Petitioners petition for review of these determinations.
 
 
 8
 We have jurisdiction under 16 U.S.C. Sec. 8251(b). We grant review, vacate FERC's order, and remand for further proceedings.
 
 
 9
 Petitioners argue that FERC erroneously restricted the breadth of its licensing jurisdiction under Sec. 23(b)(1), because that section gives it licensing jurisdiction whenever a project covered by the Act affects interstate or foreign commerce.
 
 
 10
 FERC argues for a restrictive interpretation of Sec. 23(b)(1). Under its interpretation, a project affects interstate or foreign commerce only if it affects the navigable capacity of a waterway or if the project generates power for interstate transmission. We find no such limitation in the plain language of the Act.
 
 
 11
 The Supreme Court's analysis in FPC v. Union Elec. Co., 381 U.S. 90, 85 S.Ct. 1253, 14 L.Ed.2d 239 (1965), popularly known as the Taum Sauk opinion, is instructive. There the Court considered the issue whether the Federal Power Commission's (FPC)[2] jurisdiction under the Act was limited to projects that affect navigable capacity or whether FPC could also exercise its jurisdiction based on a project's interstate transmission of power. The Court held FPC could exercise its licensing jurisdiction over the Taum Sauk project based solely on the project's interstate transmission of power. In reaching this holding, the Court reasoned,
 
 
 12
 If the comprehensive development of water power, in so far as it was within the reach of the federal power to do so, was the central thrust of the Act, there is obviously little merit to the argument that Sec. 23(b) requires a license when the interests of water commerce are affected but dispenses with the license when other commerce interests are vitally involved. The purposes of the Act are more fully served if the Commission must, as it held in this case, consider the impact of the project on the full spectrum of commerce interests.
 
 
 13
 Id. at 101, 85 S.Ct. at 1259-60 (internal quotations and citations omitted, emphasis added). Addressing the argument that jurisdiction should be limited to those projects that would affect navigation, the Taum Sauk Court stated:
 
 
 14
 there is no evidence that the sponsors of the Act, who prevailed in securing its enactment in the broad terms they drafted, intended a construction of interstate or foreign commerce narrower than their constitutional counterparts. In the face of numerous objections to this exercise of federal authority, we find it of compelling significance that the Congress adopted comprehensive language and refrained from writing any limitation or reference to navigation into Sec. 23(b).
 
 
 15
 Id. at 107, 85 S.Ct. at 1263.
 
 
 16
 FERC argues this language from Taum Sauk is unnecessarily broad. It urges us to restrict the language of Taum Sauk to the precise facts of that case, and to read its holding as limiting FERC's exercise of jurisdiction only when a project on a non-navigable waterway affects the interstate transmission of power. We decline to do so. Not only is the broad language of Taum Sauk instructive,[3] the plain language of the Act compels the conclusion that FERC has jurisdiction to license Carlson's project.
 
 
 17
 The Act grants FERC licensing jurisdiction "if upon investigation it shall find that the interests of interstate or foreign commerce would be affected by" the construction, maintenance or operation of "a dam or other project works across, along, over, or in any stream or part thereof ... over which Congress has jurisdiction under its authority to regulate commerce with foreign nations and among the several states." Section 23(b)1 of the Federal Power Act, 16 U.S.C. Sec. 817(1). This language does not limit licensing to some specified projects affecting interstate or foreign commerce. As the Court in Taum Sauk reasoned, it is "of compelling significance that the Congress adopted comprehensive language and refrained from writing any limitation or reference to [navigation in Taum Sauk, interstate transmission of power here] into Sec. 23(b)." Taum Sauk, 381 U.S. at 107, 85 S.Ct. at 1263.
 
 
 18
 It is undisputed that the commerce powers of Congress extend to the protection of spawning of anadromous fish from the Columbia River Basin, a basin fed in part by the Allison Creek tributary. Nor is there any dispute that Carlson's dam prevents the spawning of anadromous fish in the portion of Allison Creek above the dam. Moreover, it cannot be denied that the loss of spawning habitat has depleted the stock of anadromous fish in the Columbia River Basin, and that this has had an impact on interstate and foreign commerce.
 
 
 19
 FERC argues, however, that notwithstanding any effect the Carlson project may have on interstate or foreign commerce, we should uphold FERC's interpretation of the Act because we are required to give that interpretation deference under Chevron U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837, 842-845, 104 S.Ct. 2778, 2781-2783, 81 L.Ed.2d 694 (1984). We disagree. Such deference is due only when a statute is ambiguous and when Congress has not expressed any intent on the issue before the court. Id. at 844-45, 104 S.Ct. at 2782-83. Here, the language setting forth the Act's jurisdictional reach is not ambiguous; and the Supreme Court has determined Congress intended in passing the Act to invoke its full Commerce Clause powers. Taum Sauk, 381 U.S. at 96, 101, 107, 85 S.Ct. at 1257, 1259, 1262.
 
 
 20
 Finally, FERC presents a floodgates argument. It contends if we interpret its jurisdiction under the Act to extend beyond projects that affect navigation or transmit power interstate, we will bring within its licensing requirements an enormous number of projects never intended to be subjected to its licensing jurisdiction. We reject this argument. Congress, not this court, has determined the scope of FERC's licensing jurisdiction. It is not our place to question that legislative determination. Moreover, FERC's concern is overstated. Only those projects that have a "real and substantial" impact on interstate or foreign commerce need be licensed. City of Centralia v. FERC, 661 F.2d 787, 791 (9th Cir.1981).
 
 
 21
 Here, FERC concluded that even if it could assert jurisdiction over Carlson's project, the effect of the project on the anadromous fishery was "too insubstantial" to affect interstate or foreign commerce. Petitioners challenge this conclusion.
 
 
 22
 We have carefully reviewed the record. There was substantial evidence presented to FERC to support a determination that Carlson's project has a substantial impact on anadromous fish, affecting commercial, recreational and tribal fishing interests in the Columbia River Basin and the Pacific Ocean. It appears FERC did not fully consider this evidence. Moreover, all parties agree that if we should hold, as we do, that FERC has licensing jurisdiction over Carlson's project, this case should be remanded to FERC for development of a complete record on the question whether the impact of Carlson's project is "too insubstantial" to affect commerce. See City of Centralia, 661 F.2d at 792-93. We will do as the parties ask.
 
 
 23
 The petitioners' petition for review is GRANTED. FERC's order determining that it lacks licensing jurisdiction over the Carlson project is VACATED. This case is REMANDED to FERC for further proceedings to determine whether the Carlson project has too insubstantial an effect on interstate or foreign commerce to require licensing under the Act.
 
 
 24
 Review GRANTED. Order VACATED. Case REMANDED.
 
 TROTT, Circuit Judge, Dissenting:
 
 25
 Today, we conscript an unwilling Federal Energy Regulatory Commission ("FERC") into the laudable battle to save the salmon even though the tiny private dam in question impacts neither navigability nor interstate electrical power. We do so notwithstanding FERC's reasonable declination of jurisdiction in this case based on FERC's interpretation of Section 23(b)(1) of the Federal Power Act. In so doing, we disregard the rule of law that requires us to defer to an agency's interpretation of its primary enabling statute under circumstances where (1) the intent of Congress manifestly requires interpretation, and (2) the agency's construction of the statute is reasonable. See Transpacific Westbound Rate Agreement v. FMC, 951 F.2d 950, 952-53 (9th Cir.1991); see also Mississippi Power and Light v. Moore, 487 U.S. 354, 380-82, 108 S.Ct. 2428, 2443-45, 101 L.Ed.2d 322 (1988) (Scalia, J., concurring); Chevron U.S.A., Inc. v. Nat'l Res. Dev. Council, 467 U.S. 837, 842-45, 104 S.Ct. 2778, 2781-83, 81 L.Ed.2d 694 (1984).
 
 
 26
 By giving the term "commerce" its full-blown meaning in this context, we simply permit an unforeseen cart to run away with the horse. Nowhere does Congress expressly or even impliedly instruct the Commission in the Federal Power Act to require licenses of projects based on their effect on fish. As the Commission wisely said, "in interpreting section 23(b)(1), we must apply some common sense. The phrase 'interests of interstate commerce,' outside the context of the Federal Power Act, contemplates a wide spectrum of interests, far beyond what we believe Congress had in mind when it established the Commission as the federal entity to oversee the private and municipal development of our nation's water power potential." 62 FERC 61,017 (Jan. 29, 1993).
 
 
 27
 To deal with Guy Carlson's small dam as a "hydroelectric project" within the contemplation of the Federal Power Act is a classic exercise in form over substance. Such an indiscriminating approach evokes Emerson's observation that "foolish consistency is the hobgoblin of little minds, adored by statesmen and philosophers and divines" (although my colleagues certainly do not belong in such company).[1] Why the Federal Energy Regulatory Commission must become involved in the building of a dam that doesn't affect at all interstate electrical power or navigability completely escapes me. Such a quirky holding gives new meaning to the word "illogical," and as such, it stands as Exhibit A for the proposition that the scope of the statute requires authoritative interpretation by its implementing agency. Why? Because once you start from the undisputed proposition that this dam does not implicate interstate electrical power or navigability, then, measured by the purpose of the Federal Power Act, Guy Carlson's dam is the equivalent of a dam that generates no electricity at all. Why such a dam would require a license from the Federal Energy Regulatory Commission is problematic at best. One can only wonder whether our legitimate concern for the fish has clouded our vision.
 
 
 28
 The proof of the pudding is, once again, in the eating. Q.E.D. Moreover, today it's fish, but what commerce interest will it be tomorrow? Recreation? Tourism?
 
 
 29
 Taum Sauk does not support the majority's blunt instrument approach to this issue. FPC v. Union Elec., 381 U.S. 90, 85 S.Ct. 1253, 14 L.Ed.2d 239 (1965). As the Commission points out, Taum Sauk focused "solely on the principal use to be developed and regulated in the FPA: the production of hydroelectric power to meet the needs of an expanding economy--not the myriad of potential products that could possibly be harvested from our nation's waters, such as fish." 62 FERC at 61,019.
 
 
 30
 The Commission was correct when it said that "a federal agency's authority to regulate is no more intrusive on the right of states or the rights of individual citizens than what Congress has expressly authorized." Id. at 61,017. In this case, we have haphazardly extended that authority beyond its intended limits. If the fish are to be saved, the methods by which the rescue is effected must be legitimate. Here, the method blessed by the majority is not. Once again, a law enacted for one purpose is abused to pursue something for which it was never designed. Thus, I respectfully dissent.
 
 
 
 [1]
 Anadromous fish are "[a]quatic, gill-breathing, vertebrate animals bearing paired fins which migrate to and spawn in fresh water, but which spend part of their life in an oceanic environment; also fish in the Great Lakes that ascend streams to spawn." 50 C.F.R. Sec. 401.2(g)
 
 
 [2]
 The Federal Power Commission was the predecessor to FERC
 
 
 [3]
 "See United States v. LaBinia, 614 F.2d 1207, 1210 (9th Cir.1980) (unless the Supreme Court expressly limits its opinion to the facts before it, it is the principle which controls and not the specific facts upon which the principle was decided)." United States v. Underwood, 717 F.2d 482, 486 (9th Cir.1983)
 
 
 [1]
 Emerson, R.W., "Self Reliance," Essays: First Series (1841)